THE UNITED STATES, APPELLANTS, *v.* JOHN ROSE AND GEORGE KINLOCK.

Sutter's general title to lands in California again examined, together with the historical events which preceded and attended it. The court again decides that claims under this title are not valid.

THIS was an appeal from the District Court of the United States for the northern district of California.

The facts of the case are stated in the opinion of the court.

It was argued by *Mr. Stanton* for the United States, and by *Mr. Crittenden* and *Mr. Benjamin* for the appellees.

One of the objects of the counsel for the appellees was to induce the court to reconsider the decision in the cases of Bassett and Nye, reported in 21 Howard; and another, to show that if the judgment in those cases were to stand, the present case did not fall within it.

*Mr. Crittenden* reviewed the facts of the case, and contended that the grant was within the power of the Governor; that it was an exercise of political power, binding on all concerned; that it proceeded from the highest executive authority charged to do that very act; that it rested upon the same principles as the case of Chisolm *v.* the State of Georgia; that we had no right to inquire into the motives of the Governor. He was besieged, and made a speech to the people, whom he wished to induce to support his authority; that the transaction resembled our revolutionary promises, when Congress appealed to the people to sustain the war of independence; that the Governor conferred a present right, in which there was no ambiguity; that the court appeared to think, in the former decision, that the Governor only promised a grant, whereas it took effect at once; that it was a valid act of political power, no matter what the motives were; that one construction impeached the motives of the Governor and the integrity of the people, and the other only confirmed an act of justice.

With respect to the circumstances which distinguished this case from Nye's, *Mr. Crittenden* referred to the following:

John Smith was one of the class entitled under the general grant of the 22d December, 1844. It is proved that before that date, in the year 1844, he had presented to the Governor, Micheltorena, his petition, with a map or diseno, for the six leagues of land in question—called or marked on the map, "Rancho de Yuba," and "bounded on the north by the river Yuba, on the west by Sutter's claim, on the south by Johnson's ranch, and extends eastwardly so as to contain six square leagues;" and that he had also obtained the favorable report

of Sutter, to whom his petition had been referred, in the usual course.

It is further proved that Sutter recognised Smith as one of the persons entitled, and gave him a copy of the "general title" as evidence of his right.

It is further proved that Smith lost all his title papers— their loss, their authenticity, and their contents, are all clearly proved.

Smith was put in possession by Sutter, and within twelve months after the date of the "general title," he was in the occupation of the land, "made improvements, and built an adobe house, and had upon the said land about 400 head of cattle, with some horses."

Bidwell's testimony is, that Smith settled on the land in the fall of 1844, or early in 1845, and continued to live upon it till he sold in 1848. He had previously lived on adjoining land, which he had purchased of Sutter.

Smith's petition for the land in question, and the favorable report thereon by Sutter, were made to the Governor in September, 1844; and in that year, according to his own testimony, he not only made improvements, but "had about six hundred cattle and a few horses on this land." He was a Canadian by birth, was naturalized as a Mexican, and had been in California since 1835.

It does not appear that he was ever engaged in the military service, or that the grant was made to him otherwise than in the due administration of the colonization laws of Mexico.

These latter circumstances distinguish the present case from those of Nye and Bassett, reported in 21 Howard, 408, *et seq.*

*Mr. Benjamin* reviewed the facts of the case, and said the claimant had been put into possession, and the only way to get him out was to drive him from the soil. He then reviewed the preceding decisions in California cases, and contended that the rules established in Fremont's and subsequent cases were reversed in that of Nye. The Louisiana and Florida cases were applicable. Where there was permission to settle and possession taken, it constituted an equitable title. True, there was an uprising of the people and a stump speech;

*United States* v. *Rose et al.*

but the political power was there, and ready to act. Had not the Governor power to confirm these grants, one by one? You confirmed Larkin's title, issued from the same place, because it was to one person only. The Governor was sent there, and had extraordinary powers, (for which *Mr. Benjamin* referred to 3 Archives, in U. S. *v.* Limantour, page 5.)

*Mr. Stanton*, in reply to these arguments, said that the only question was, whether or not this was public domain. Sympathy was out of the case. The possession of the claimant was doubtful; but if true, what right did that give? Sovereignty was always in possession, and could not be ousted. The court cannot confirm this claim without obliterating all previous decisions. There are no new facts proved. The court held in Cambuston's case (20 Howard, 59) that they would inquire into the motives of the grant, and all the circumstances attending it. The Louisiana and Florida cases were not like these; the difference is pointed out by the court in Cambuston's case, (20 Howard, 63.) The instructions to Micheltorena were before the court in a former case. Whatever power he might have proclaimed to the people that he possessed, when his instructions were produced they did not justify him. A change in political government did not authorize the Chief or President to change the law. Santa Anna, in his instructions to Micheltorena, did not attempt to change the law; he made a difference between foreigners and natives, and said that "foreigners ought to be prevented from taking part in domestic quarrels." If those people had no claim upon the Mexican Government, they have none on ours. The Mexican laws give them no claim. The cases referred to by the counsel on the other side as being confirmed, were all genuine grants, made strictly within the colonization laws.

Mr. Justice CAMPBELL delivered the opinion of the court.

The appellees were confirmed in a tract of land in Yuba county, California, containing six square leagues, bounded north by the Yuba river, west by the eastern line of Captain Sutter's land, south by Johnson's rancho, and easterly for quantity.

The original claimant is John Smith. He was examined as a witness, and testifies that he was a naturalized citizen of Mexico. That in September, 1844, he petitioned the Governor of California for the land, and obtained a favorable report from Captain Sutter, and in 1845 received from the latter a copy of the "general title," which the Governor had authorized him to give. That in 1844 he built a house upon the land, planted an orchard of fruit trees, and in that and the following year enclosed a field by ditches, and cultivated it, and that he had there a stock of cattle. He says he resided on the land until 1848, when he sold it to persons under whom the claimants derive their claim.

To account for the non-production of any documentary evidence, he says that the petition and report, with a copy of the general title, were lost in the Sacramento river in 1845; that subsequently he obtained another copy, and this, with his naturalization papers, was sent to Monterey, to be laid before the Departmental Assembly, but that they were never returned to him. Bidwell testifies that he prepared a petition for Smith to Sutter, representing the loss of his papers, and asking for another copy of the title, and that Sutter admitted the claim. He testifies that Smith cultivated the land.

The two depositions of Sutter show that he recognised the claim of Smith to have the benefit of the general title, and that he gave him copies, as stated by the other witnesses. Other testimony in the record disproves the statements of these witnesses in reference to the improvement of the land, and shows satisfactorily that they were made on a different tract of land, and in no connection with this claim.

The "general title of Sutter" was considered by the court at its last term, and its operation declared in the cases of the United States *v.* Nye and the United States *v.* Bassett, reported in 21 How. R., 408, 412. The opinion of the court in those cases has been examined in the argument at the bar, and has been re-examined by the court.

The testimony of Sutter in the case of Nye was, that the general title was enclosed to him in a letter by Micheltorena, the Governor, by his request. That the Governor was block-

aded at Monterey, and was in need of military aid, and the general title was sent to him upon his advice. That he executed the trust conferred upon him, by giving copies of the title to those "who had rendered meritorious services to the country, and who applied to him." The general title was issued before his men marched from New Helvetia to join Micheltorena, and, in some cases, copies were given before and some after his return from the expedition, "but only to such as he thought deserved it." Governor Micheltorena made a speech to the soldiers, and promised to deliver grants to all "whom he should recommend," "referring as well to those to whom copies had been delivered as to those to whom he should deliver them."

In the cases of Nye and Bassett, it was proved that the claimants were soldiers in the war of Micheltorena, and had taken possession of the land within their claim under a temporary license from the Governor. There is no evidence of the kind in this case. The statement of facts in this testimony, and the inferences drawn from it by the court, are corroborated by public documents existing in the archives of California. These show that, in the autumn of 1844, there was an insurrection against the authority of Micheltorena, which terminated in a compact signed at Santa Teresa, the 1st December of that year, by the contending chiefs. Micheltorena agreed to disband and send away a battalion of infantry, (presidiarios,) "with some vicious officers," within three months, and should himself retire to Monterey; that the headquarters of the opposing forces should be at San José, and that their expenses should be charged to the Department. In that month, both parties recommenced preparations for renewing hostilities. On the 24th of December, Alvarado asked Sutter for explanations "in relation to the assembling of men" at his fort, and charged him with the design of "invading the Californias."

He transmitted to Micheltorena a copy of this letter, and arraigned Sutter "for preparing to attack the forces of the north, under the pretext of placing himself in the defence of Micheltorena's Government, claiming to have relations with

him for this purpose." . He says : " Considering the movement of Sutter and his conduct as an arbitrary act of his own, unauthorized by the Government, and knowing positively that he is organizing a force, composed of adventurers and Indians, to attack this garrison, I assure your Excellency that I am in a condition to make a defence, and to attack him as soon as he marches against this place, to carry out his dark designs."

On the 28th December, Micheltorena replied to a letter from Sutter, in which he says : " I approve in its whole what you say to me in your last.  What you may do, I approve ; what you may promise, I will fulfil ; what you may spend, I will pay. * * * The country calls for our services ; our personal security requires it, and the Government will know how to recompense all. * * * If you have not left, owing to some event, without the necessity of a new order, when you learn that I am moving from Monterey to San Juan, you will move at once ; for I will have well calculated the time to act against them."

On the 12th January, 1845, he addressed a letter to an officer, in which he says : " All which is said to you under this date by Senor Don Sutter, who is now, with arms in hand, defending the rights of the nation, and, supporting the Departmental Government that I exercise, will be duly obeyed by you."

Sutter, under these orders, reached Santa Barbara in the early part of February, with two companies, and placed them under the command of Micheltorena.

On the other hand, Alvarado and Castro, in January, 1845, denounced the Governor to the Departmental Assembly, "that he appointed as commander of armed adventurers the same Sutter, of whom there is sufficient evidence that he seeks to possess himself of the Department, attacking the national integrity ; a proof that the country is in danger ; and the presumption is, that Governor Micheltorena does not deserve the public confidence."  They arraign him, because he had called "to promote civil war in the country the foreigner, (Sutter,) accused before the Supreme Government of the country as a conspirator against the national integrity, and

because united to more than one hundred adventurous hunt ers, proceeding from the United States, without more fortune than the muzzles of their rifles, he has increased his files, and causing devastation," &c.   They asserted to the Departmental Assembly, as the only legal authority which they and their party recognised, "that General Micheltorena is a traitor to his country, and as such he ought to be presented to the tribunals of the Republic, to be judged in accordance with the laws.   2d. That the Assembly should in the interim regulate all the branches of the administration.   3d. That they should transmit the charges against the Governor to Mexico, by a commission, and ask that the Government of the Department may be committed to its natives and residents, of sufficient capacity and knowledge for its management.

This communication was referred to a committee of the Assembly, who reported that the Governor had repudiated the compact of Santa Teresa, and prepared himself to chastise those who had demanded its conditions; that his connection with Sutter was dangerous to the safety of the Department, and had deprived him of the support of the citizens, "for there is not a single individual therein," they say, "who, at seeing Don John Auguste Sutter commence a campaign in California, that does not remember that this gentleman has expressed his fatal design of subduing the country."

On the 15th February, the Departmental Assembly disa- vowed the authority of the Governor, pronounced his office vacant, and called upon Pio Pico, the first member of the Assembly, to take charge of the Departmental Government in the interim.

On the 22d February, 1845, a treaty was concluded between the commissioners of the Assembly and of the Governor, which was sanctioned by the respective chiefs, in which it was stipulated "that, from this date, the political command of the Department is delivered to the first member of the most excel- lent Departmental Assembly, because it was so disposed by said body, agreeably to the laws; for which purpose, his Excellency General Micheltorena will deliver a circular order in the hands of the chief of the division of the opponents, that

the same be published throughout the limits of the Department."

It is acknowledged that the Governor "could no longer contend, with his small forces and scanty resources, against the general outbreak of the country;" and therefore he obligates himself to march to San Pedro, thence to be conveyed to Monterey, and thence to some port in the Republic of Mexico.

Sutter remained a prisoner in the hands of his enemies. On the 26th of the month, (February,) he addressed a letter to Pio Pico, as Governor, in which he speaks of his detention in the city, and attributes it to his connections with Micheltorena. He refers to his relations and duties as an officer, protests that he was ignorant, and deceived as to the cause of the insurrection against Micheltorena, and that he was then convinced of his delusion, and repented of his credulity. He promises obedience to the authorities, offers to place his fort at the disposal of the Government, and prays for his release. It does not appear that he was able to return home until the first of April, about which time Micheltorena sailed from Monterey.

Pio Pico remained in charge of the Government, as senior member of the Assembly, until the 15th day of April, 1846, when he was installed as constitutional Governor of the Department, pursuant to an appointment made in consequence of the memorial of the Assembly on the 27th of June of the previous year.

We have entered into this minute statement of the relations of Sutter to the authorities of Mexico, and especially those in the Department of California, in order to estimate with exactness the import of his acts, under the power conferred by Micheltorena, and how far they imposed an obligation upon the public faith of those Governments, and upon this Government, as their successor.

The authority of Micheltorena to distribute the lands of the Department arises in the colonization laws of 1824 and 1828. The object of those laws was to secure for the Republic a population composed of industrious, obedient, and loyal

citizens, who might contribute to its strength and pros perity.

In the distribution of the public domain for this purpose, the political chief was directed to inform himself particularly of the circumstances and condition of every applicant for land; and that his power of selection should not be inconsiderately or corruptly used, he was required to preserve a record of his acts of administration, and to submit reports to the Departmental Assembly and the Supreme Government, the approval of one or the other being necessary for their definitive validity.

The claims presented to the land commission of the United States in California, and to this court on appeal by the claimants, under the "general title of Sutter," exhibit a wide divergence from the essential rules prescribed in the colonization laws. The petition is not preserved in the archives, but was retained by the applicant. The Governor declined to act, until he could examine the country of which the colonization is proposed. In the absence of the petition, and without the desired information, under a "supreme pressure of business," he decides suddenly to send to a subordinate and suspected officer the authority to determine the most serious question of administration confided to his care—that of selecting persons who should own and occupy the soil of the Department. He does not preserve a record of this act, nor a copy of the paper he issues, nor did he present it to the Departmental Assembly for its ratification.

We are compelled to seek an explanation of this anomalous exercise of authority, and to examine the conditions attached to this unusual mode of administration; to inquire of the relation which the proposed objects of the favor occupied and were to occupy to the Department and its authorities, and the consequences contemplated by the Governor and his agent to ensue from their use of this title, to ascertain its signification. We have no doubt that the court may employ this medium of proof for this purpose.

We learn that the treaty concluded at Santa Teresa was an armistice merely, and that Micheltorena, immediately after,

concluded to use the agency and influence of Sutter to punish his enemies and sustain his power; and, to increase that influence, issued this "general title." Their alliance was regarded by the Departmental Assembly as treasonable, and justifying the deposition and expulsion of the Governor from the Department. Sutter became their prisoner, and was compelled to renounce his connection with his chief to make his peace. His companies were regarded as public enemies, and were disbanded and dispersed. The Supreme Government acquiesced in the decisions of the Assembly, and recognised and commissioned the Governor of their appointment.

No indemnity was granted to the adherents of Micheltorena, nor provision made for the fulfilment of his promises to them; nor have we discovered an instance in which their accomplishment was demanded of the succeeding Government. Our opinion consequently is, that these acts and promises were not considered in California or Mexico as valid obligations, binding the conscience of the Republic; and therefore they are not valid claims under the treaty of Guadalupe Hidalgo.

In some of the instances, Micheltorena granted a permission to the applicant to occupy the land provisionally, until he could visit that portion of the Department to act upon their petition. It is contended that this license is so far a recognition of the merit of the application, as to impose upon the United States the obligation to accede to it; that it confirmed an interest in the land, that they should perpetuate by a grant.

We agree that every species of title that originated in the rightful exercise of legitimate authority, and existed under the safeguard of Mexican laws at the date of the acquisition of California by the United States, is protected by the treaty of cession. The change of the Government does not alter the relations of the inhabitants in this particular. This court is charged with the duty, in the last resort, to recognise the validity of all such claims. But it is the duty of the court to distinguish between rights acquired under the laws and usages of Mexico, and claims depending upon the mere pleasure of those who were in power—between the vested estate and the hope or expectation of favor or bounty. The license of the

Governor to the applicant to make a temporary occupation, until he could inform himself, so as to act considerately or intelligently, we think, cannot be treated as conferring a property in the land.

We have examined these cases with unusual care, in consequence of the number of parties in interest and the amount of property involved. Upon the most liberal estimate of the powers of the Governor, and the most indulgent view of the claims of the petitioners, we are unable to determine that they are valid.

Judgment of the District Court reversed, and cause remanded, with directions to dismiss the petition.