## NORTHWESTERN BANDS OF SHOSHONE
## INDIANS *v.* UNITED STATES.

No. 63.   Argued November 10, 13, 1944.—Decided March 12, 1945.

*Mr. Ernest L. Wilkinson,* with whom *Messrs. Joseph Chez, John W. Cragun, Herman J. Galloway, Frank K. Nebeker, Charles J. Kappler,* and *Clinton D. Vernon* were on the brief, for petitioners.

*Mr. Robert E. Mulroney,* with whom *Solicitor General Fahy, Assistant Attorney General Littell* and *Mr. Norman MacDonald* were on the brief, for the United States.

*Messrs. Bert H. Miller,* Attorney General of Idaho, and *Grover A. Giles,* Attorney General of Utah, filed a brief on behalf of the States of Idaho and Utah, as *amici curiae,* supporting petitioners.

MR. JUSTICE REED delivered the opinion of the Court.

The Northwestern Bands of Shoshone Indians, petitioners here, seek to recover from the United States damages estimated at fifteen million dollars for the taking of some fifteen million acres of the lands held by these Indians by aboriginal or immemorial title. This title was alleged by the Indians to have been recognized by the United States by the treaty between the petitioners and the United States at Box Elder, Utah Territory, July 30, 1863.

The suit was begun in the Court of Claims against the United States by the bands pursuant to a special jurisdictional act of Congress of February 28, 1929, 45 Stat. 1407. The Act consented to suit and recovery against the United States upon the following conditions:

"That jurisdiction be, and hereby is, conferred upon the Court of Claims, notwithstanding lapse of time or statutes of limitations, to hear, adjudicate, and render judgment in any and all claims which the northwestern bands of Shoshone Indians may have against the United States arising under or growing out of the treaty of July 2, 1863 (Eighteenth Statutes, page 685—2 Kappler, 848); treaty of July 30, 1863 (Thirteenth Statutes, page 863 [663]—2 Kappler, 850); Act of Congress approved December 15, 1874 (Eighteenth Statutes, page 291), and any subsequent treaty Act of Congress, or Executive order, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States." [1]

This Court has jurisdiction to grant certiorari under the jurisdictional act and § 3 (b), Act of February 13, 1925, 43 Stat. 939, as amended by Act of May 22, 1939, 53 Stat. 752; see *Colgate* v. *United States,* 280 U. S. 43. Certiorari was granted in view of the importance of the question in Indian affairs.

The suit is based upon the unlawful taking after the alleged recognition of the Indian title by the Box Elder treaty. We do not read the petition as claiming any right to compensation for the extinguishment of an Indian aboriginal title, which was unrecognized or unacknowledged by the Box Elder treaty. Under the words of the jurisdictional act, "arising under or growing out of the treaty," suit is authorized only for rights acknowledged by the treaty. The act does not authorize a suit for loss of Indian tribal rights arising from any other acts of the United States. If the treaty recognized the aboriginal

---

[1] The other sections of the jurisdictional act are routine and not here involved. They provide for the employment of attorneys for the Indians, for set-offs to the United States, for review in this Court, process, service on and appearance by the Attorney General and the disposition of sums recovered.

or Indian title, the authority to sue for the taking under the jurisdictional act is not questioned.[2] No claim is brought forward by petitioners arising under or growing out of the other treaties, acts or orders which are referred to in the jurisdictional act. See *Northwestern Bands of Shoshone Indians* v. *United States*, 95 Ct. Cls. 642, 680.[3]

The Court of Claims determined that the claim for the taking of land sued upon by petitioners did not grow out of the Box Elder treaty. Certiorari was sought and granted to determine whether there was "recognition" or "acknowledgment" of the Indian title by this treaty through the language employed or by the act of entering into a treaty with the Indians as to the use by the United States of lands which were claimed by the petitioners.

Even where a reservation is created for the maintenance of Indians, their right amounts to nothing more than a treaty right of occupancy. *Shoshone Tribe* v. *United States,* 299 U. S. 476, 496. Prior to the creation of any such area, formally acknowledged by the United States as subject to such right of Indian occupancy, a certain nation, tribe or band of Indians may have claimed the right because of immemorial occupancy to roam certain territory to the exclusion of any other Indians and in contradistinction to the custom of the early nomads to

---

[2] The claim upon which the Indian Affairs Committee of the House based its recommendation for the passage of an identical jurisdictional act was a claim for the taking of this aboriginal title which the Committee said was recognized by the Box Elder treaty. H. Rep. No. 1030, 70th Cong., 1st Sess.; cf. *United States* v. *Creek Nation,* 295 U. S. 103, 108.

[3] In a similar jurisdictional act for the benefit of the Eastern Shoshone the question of whether their claim arose under or grew out of a certain treaty was not involved. That treaty, Fort Bridger, July 3, 1868, specifically recognized and set apart a reservation for the Eastern Shoshone. Art. II, 15 Stat. 673; 44 Stat. 1349; *Shoshone Tribe* v. *United States,* 299 U. S. 476.

wander at will in the search for food. *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 345. This claim has come to be known as Indian title and is likewise often spoken of as the right of occupancy. To distinguish from a recognized right of occupancy, we shall refer to the aboriginal usage without definite recognition of the right by the United States as Indian title.

Since *Johnson* v. *M'Intosh*, 8 Wheat. 543, decided in 1823, gave rationalization to the appropriation of Indian lands by the white man's government, the extinguishment of Indian title by that sovereignty has proceeded, as a political matter, without any admitted legal responsibility in the sovereign to compensate the Indian for his loss. Exclusive title to the lands passed to the white discoverers, subject to the Indian title with power in the white sovereign alone to extinguish that right by "purchase or conquest." 8 Wheat. at 574, 585–88. The whites enforced their claims by the sword and occupied the lands as the Indians abandoned them.[4] Congress has authorized suits on the original Indian title but no recovery has as yet been obtained on that ground. See *Coos Bay Indian Tribe* v. *United States,* 87 Ct. Cls. 143; cf. *Wichita Indians* v. *United States,* 89 Ct. Cls. 378, 413, 414. In this case, however, the success of the claim depends not upon proof of the Indian title, which may be admitted, 95 Ct. Cls. at 690, but upon recognition of that title by the Box Elder treaty. It is quite understandable from the point of view of both petitioners and Congress that the Government should limit its submission to suits to claims under the boundaries if acknowledged by the treaty rather than to consent to judicial examination of claims for tak-

---

[4] *Beecher* v. *Wetherby*, 95 U. S. 517, 525; *Buttz* v. *Northern Pacific R. Co.,* 119 U. S. 55, 70; *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 564; *United States* v. *Santa Fe Pacific R. Co.,* 314 U. S. 339, 347.

ing the unknown area of their possible Indian title.[5]   The Shoshone Indian title was in Indian country (Act to regulate trade and intercourse with the Indian tribes, 4 Stat. 729; *Bates* v. *Clark,* 95 U. S. 204, 206–208) and as a consequence subject to all the uncertainties of definition of boundaries and difficulties of proof to establish aboriginal title for tribes with a shifting habitat.

The decisive question in this case is whether it was intended by the Northwestern Shoshone or Box Elder Treaty of July 30, 1863, to recognize or acknowledge by implication the Indian title to the lands mentioned in that treaty.   *United States* v. *Santa Fe Pacific R. Co.,* 314 U. S. 339, 347.   From such recognition or acknowledgment by this treaty would flow a right of occupancy which would be compensable under the jurisdictional act.

Full findings of fact appear with the opinion below in *Northwestern Bands of Shoshone Indians* v. *United States,* 95 Ct. Cls. 642.   These findings show that petitioners here, the Northwestern bands, were at the time of the treaty a part of the Shoshone tribe, a nomadic Indian nation of less than ten thousand people which roamed over eighty million acres of prairie, forest and mountain in the present states of Wyoming, Colorado, Utah, Idaho and Nevada.   The group with which we are concerned was comprised of some fifteen or eighteen hundred persons and claimed, by the treaty, Indian title to some ten million acres and now claim compensation for over six million additional acres.

---

[5] Letter of Commissioner Doty, transmitted by Message of the President, January, 1864, Executive K, L, M, N, O, 38th Cong., 1st Sess., p. 17:

"As none of the Indians of this country have permanent places of abode, in their hunting excursions they wander over an immense region, extending from the fisheries at and below Salmon falls, on the Shoshonee river, near the Oregon line, to the sources of that stream, and to the buffalo country beyond."

After the discovery of gold in California, white travelers
and settlers began to traverse and people the Shoshone
domain with the result that the Indians' game disap-
peared from their hunting grounds. Racial relations de-
generated to the point that Indian depredations interfered
with travel and settlement, the overland mails and the
new telegraph lines. By the time of the outbreak of the
Civil War the Commissioner of Indian Affairs, the agents
and superintendents of the Shoshone territory were aware
of the misery of the Shoshones, the dangers to the emi-
grant trains and need for peace to enable travel and settle-
ment in the area. Word had reached the Commissioner
from his superintendent in Utah that the Shoshone were
inclined toward accepting support on limited reservations
and were willing in return to cede their other lands to the
United States.

On July 5, 1862, 12 Stat. 512, 529, Congress appropri-
ated $20,000 for defraying the expenses of negotiating
a treaty with the Shoshones. The appropriation followed
a letter from the Secretary of the Interior to the chairman
of the House Committee on Indian Affairs expressing the
view that the lands owned by the Indians of Utah were
largely unfit for cultivation and that it was "not probable
that any considerable portion of them will be required
for settlement for many years." A special commission
was promptly appointed and instructed that it was not
expected that the proposed treaty would extinguish In-
dian title to the lands but only secure freedom from
molestation for the routes of travel and "also a definite
acknowledgment as well of the boundaries of the entire
country they claim as of the limits within which they
will confine themselves, which limits it is hardly neces-
sary to state should be as remote from said routes as
practicable."

As the distances made it impracticable to gather the
Shoshone Nation into one council for treaty purposes, the
commissioners made five treaties in an endeavor to clear

up the difficulties in the Shoshone country. These are set out in full in the report below. 95 Ct. Cls. 642. Four will be found also in 13 Stat. 663, 681, and 18 Stat. 685, 689. The fifth or Mixed Band treaty was not proclaimed. It is at 5 Kappler 693. It is sufficient here to say that by the treaties the Indians agreed not to molest travelers, stage coaches, telegraph lines or projected railroads.[6] All

---

[6] Articles II and III from the Fort Bridger treaty of July 2, 1863, the one first made, will illustrate the type of agreement:

"ARTICLE II. The several routes of travel through the Shoshonee country, now or hereafter used by white men, shall be and remain forever free and safe for the use of the Government of the United States, and of all emigrants and travellers under its authority and protection, without molestation or injury from any of the people of said nation. And if depredations should at any time be committed by bad men of their nation, the offenders shall be immediately seized and delivered up to the proper officers of the United States, to be punished as their offences shall deserve; and the safety of all travellers passing peaceably over said routes is hereby guaranteed by said nation. Military agricultural settlements and military posts may be established by the President of the United States along said routes; ferries may be maintained over the rivers wherever they may be required; and houses erected and settlements formed at such points as may be necessary for the comfort and convenience of travellers.

"ARTICLE III. The telegraph and overland stage lines having been established and operated through a part of the Shoshonee country, it is expressly agreed that the same may be continued without hindrance, molestation, or injury from the people of said nation; and that their property, and the lives of passengers in the stages, and of the employees of the respective companies, shall be protected by them.

"And further, it being understood that provision has been made by the Government of the United States for the construction of a railway from the plains west to the Pacific ocean, it is stipulated by said nation that said railway, or its branches, may be located, constructed, and operated, without molestation from them, through any portion of the country claimed by them."

Article IV relating to boundaries in this Fort Bridger treaty reads as follows:

"It is understood the boundaries of the Shoshonee country, as defined and described by said nation, is as follows: On the north, by

the Shoshone treaties were similar in form. They show that the boundaries claimed, as petitioner points out, covered the entire Shoshone country. After all five were negotiated Commissioner Doty was able to trace a rough map of the Shoshone country to show the Commissioner of Indian Affairs "the exterior boundaries of the territories claimed by the *Shoshonees* in their recent treaties, as also the lines of the country occupied by different portions of the tribe indicated upon it as correctly as the map will allow." He had asked Indian Affairs for the map upon which this information was traced "to show the boundaries of the country ceded by the Shoshones."

Petitioners' treaty, the Northwestern Shoshone Treaty, needs to be set out in full for ready examination. It reads as follows:

"Articles of agreement made at Box Elder, in Utah Territory, this 30th day of July, A. D., 1863, by and between the United States of America, represented by Brigadier-General P. Edward Connor, commanding the military district of Utah, and James Duane Doty, commissioner, and the northwestern bands of the Shoshonee Indians, represented by their chiefs and warriors:

ARTICLE I. It is agreed that friendly and amicable relations shall be reestablished between the bands of the Shoshonee Nation, parties hereto, and the United States; and it is declared that a firm and perpetual peace shall be henceforth maintained between the said bands and the United States.

---

the mountains on the north side of the valley of Shoshonee or Snake River; on the east, by the Wind River mountains, Peenahpah river, the north fork of Platte or Koo-chin-agah, and the north Park or Buffalo House; and on the south, by Yampah river and the Uintah mountains. The western boundary is left undefined, there being no Shoshonees from that district of country present; but the bands now present claim that their own country is bounded on the west by Salt Lake." 18 Stat. 685–6.

ARTICLE II. The treaty concluded at Fort Bridger on the 2nd day of July, 1863, between the United States and the Shoshonee Nation, being read and fully interpreted and explained to the said chiefs and warriors, they do hereby give their full and free assent to all of the provisions of said treaty, and the same are hereby adopted as a part of this agreement, and the same shall be binding upon the parties hereto.

ARTICLE III. In consideration of the stipulations in the preceding articles, the United States agree to increase the annuity to the Shoshonee nation five thousand dollars, to be paid in the manner provided in said treaty. And the said northwestern bands hereby acknowledge to have received of the United States, at the signing of these articles, provisions and goods to the amount of two thousand dollars, to relieve their immediate necessities, the said bands having been reduced by the war to a state of utter destitution.

ARTICLE IV. The country claimed by Pokatello, for himself and his people, is bounded on the west by Raft River and on the east by the Porteneuf Mountains." 13 Stat. 663.

Before it or the other treaties were ratified by the Senate an additional article was added to each and, except for one treaty not further involved here, accepted by the Indians. The addition reads as follows:

"Nothing herein contained shall be construed or taken to admit any other or greater title or interest in the lands embraced within the territories described in said treaty in said tribes or bands of Indians than existed in them upon the acquisition of said territories from Mexico by the laws thereof."

The portions of the Fort Bridger treaty of July 2, 1863, of any possible effect will be found in note 6, *supra*.

Subsequent to the ratification of the treaties, an act of Congress was passed on February 23, 1865, 13 Stat. 432,

for the extinction of Indian title to lands in Utah territory; and another act on July 20, 1867, 15 Stat. 17, for dealing with hostile Indians and choosing reservations for Indians dwelling east of the Rocky Mountains. None of the Shoshones entered into treaties under either of these acts except the Eastern Shoshones who had signed the Fort Bridger treaty of July 2, 1863. On July 3, 1868, they relinquished all claim to United States territory except a reservation in Wyoming of 3,047,730 acres. 15 Stat. 673. No other treaty or other formal arrangement has been made between petitioners and the United States dealing with their lands.[7]

---

[7] The Court of Claims summarized the history of the petitioner bands, subsequent to the Box Elder treaty, in this way:

"After the making of the treaty of July 30, 1863, the plaintiff bands became widely scattered over northern Utah and Nevada, and southern Idaho. In 1873 the Commissioner of Indian Affairs appointed a commission to investigate all tribes and bands in this region and to ascertain their number and the probability of gathering them upon one or more reservations where they could be more immediately under the care of the Government. The commission made an exhaustive investigation into the matters entrusted to it and reported that it had no trustworthy information as to the number of bands of the Northwestern Shoshone Indians. The commission further reported that a part of the Northwestern Shoshones under Pocatello (who signed the treaty of July 30, 1863) had already gone to the Fort Hall (Idaho) Reservation in southeast Idaho, and that Chief Tav-i-wun-shea, with his small band, had gone to the Wind River (Wyoming) Reservation created and set apart under the treaty with the Eastern Shoshones in 1868. Toomontso (who had signed the Northwestern Treaty of July 30) and his band at about this time took up their abode on the Fort Hall Indian Reservation and an indefinite number of Indians of this band had gone to the Wind River Reservation. Eventually the remnants of the bands of Indians under San Pitz (a signer of the Northwestern Shoshone treaty of July 30), and Saigwits, also a party to the treaty, were induced by the commission to remove to the Fort Hall Indian Reservation, thus making a total of 400 Northwestern Shoshone Indians on the Fort Hall Reservation. The commission further reported that a careful enumeration disclosed that there were 400 North-

Without seeking any cession or relinquishment of claim from the Shoshone, except the Eastern Shoshone relinquishment of July 3, 1868, just referred to, the United States has treated the rest of the Shoshone territory as a part of the public domain. School lands were granted. 13 Stat. 32; 26 Stat. 216; 28 Stat. 109. National forests were freely created. 33 Stat. 2307; 34 Stat. 3099, 3198, 3206, 3247, 3251; 37 Stat. 1678. The lands were opened to public settlement under the homestead laws. Report of the Commissioner of the General Land Office (1868), pp. 55, 59, 63; Report of the Commissioner of the General Land Office (1869), pp. 163, 168, 177. Thus we have administration of this territory by the United States proceeding as though no Indian land titles were involved.

The Court of Claims examined the evidence adduced before it and reached the conclusion as a finding of fact that the United States "did not intend that it [the treaty] should be a stipulation of recognition and acknowledgement of any exclusive use and occupancy right or title of the Indians, parties thereto. . . . The treaty was intended to be, and was, a treaty of peace and amity with stipulated annuities for the purposes of accomplishing those objects and achieving that end." 95 Ct. Cls. at 676. This finding molded the opinion and judgment below. Whether the issue as to acknowledgment by a treaty of Indian title to land is treated as a question of fact, like

western Shoshone Indians in southern Idaho. In 1873 a number of Northwestern Shoshone Indians had gathered in northeastern Nevada and were assigned by the Indian Agent in Nevada to a small area in that section as a home. On May 10, 1877, this tract, by order of the President, was withdrawn from sale or settlement and set apart as a reservation for the Northwestern Shoshone Indians. However, in 1879, all the Indians thereon, numbering about 300, were removed to the Western Shoshone Indian Reservation known as the Duck Valley Indian Reservation in southwestern Idaho and northern Nevada." 95 Ct. Cls. at 677.

Indian right to occupancy itself, *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 345; 53 Stat. 752, or as a matter of inference to be drawn by the trier of fact from the treaty and surrounding circumstances or as a conclusion of law to be reviewed by this Court upon the record, this finding places the burden on petitioners to overthrow the judgment of the Court of Claims. In reaching its conclusion, the lower court pointed out in its opinion that nothing in the legislation or official documents, communications or instructions which brought about the treaty indicated any purpose to recognize Indian title to the territory over which the Shoshone roamed and hunted. The commissioners were instructed specifically on July 22, 1862, that they were not expected to negotiate for the extinction of the Indian title but for the security of routes over the lands and "a definite acknowledgment as well of the boundaries of the entire country they [the Indians] claim." The letter shows uncertainty as to the location of the bands. The Commissioner of Indian Affairs wrote of the Shoshone nation as roaming Utah and Eastern Washington but the very indefiniteness of the information required a statement from the Indians of their claims. 95 Ct. Cls. at 690. The Commissioner learned from the treaties that the Shoshones claimed territory in Colorado, Wyoming, Idaho, and Nevada aggregating several times the acreage in Utah. There apparently was no claim to Washington land. Commissioner Doty's letter transmitting the map describing the territories claimed by the Shoshones and telling of the negotiations has nothing that indicates the possibility of an acknowledgment by the United States of the Indian title to any of the lands. See note 5, *supra.*

An examination of the text of the Northwestern Shoshone Treaty and the others which were entered into with the other Shoshone tribes, 95 Ct. Cls. 642, shows the commissioners carefully followed their instructions. In the

Eastern Shoshone treaty, the boundaries are spoken of "as defined and described by said nation," note 6, *supra*. In the Northwestern Shoshone Treaty the land is described as "The country claimed by Pokatello, for himself and his people." In the Western Shoshone treaty permission was given for mineral prospecting and extracting and the boundaries are said to define "the country claimed and occupied." The same language is used as to the boundaries in the Shoshonee-Goship Treaty. This treaty also permitted prospecting for and the working of mines. The Mixed Bands treaty described a country "claimed by the said bands" and "as described by them." Nowhere in any of the series of treaties is there a specific acknowledgment of Indian title or right of occupancy. It seems to us a reasonable inference that had either the Indians or the United States understood that the treaties recognized the Indian title to these domains, such purpose would have been clearly and definitely expressed by instruction, by treaty text or by the reports of the treaty commissioners, to their superiors or in the transmission of the treaties to the Senate for ratification.

Petitioners argue that the permission from the Indians for travel or mining and for the maintenance of communication and transportation facilities by the United States for its citizens imply a recognition by the United States of the Indian title. They quote, as persuasive, these words from an early Indian case: "The acceptance of these cessions is an acknowledgment of the right of the Cherokees to make or withold them." *Worcester* v. *Georgia,* 6 Pet. 515, 556. An examination of the circumstances under which this Court made the just-quoted statement illustrates how inapposite its use by petitioners is to the present question. The quotation was written in explanation of rights of passage which were granted by the Cherokees through lands which by other articles of the treaty had been specifically set apart and solemnly guaranteed to the Cherokees. 7 Stat. 39. No such specific recognition is in

the Box Elder treaty. But we see nothing inconsistent with non-recognition of the Indian title and the insertion of these provisions against molestation of structures, travelers or exploiters of mineral deposits within the territories. The United States undoubtedly might have asserted, at the time of the treaty, its purpose to extinguish Indian title or it might have recognized Indian title or it might, as the Court of Claims held, have sought only freedom from hostile acts from roving bands by the commitments for supplies. The treaties were made in the midst of civil war and before the outcome of that conflict was clear.

Petitioners urge that recognition of the Indian title was inferred from the language of the Fort Laramie treaty of September 17, 1851, 11 Stat. 749, *Fort Berthold Indians* v. *United States,* 71 Ct. Cls. 308; *Assiniboine Indian Tribe* v. *United States,* 77 Ct. Cls. 347, 370; *Crow Nation* v. *United States,* 81 Ct. Cls. 238, 272, and that a different inference in the present case is inconsistent with those holdings. Apart from the fact that different treaties are involved, the circumstances surrounding the execution of the Fort Laramie treaty indicate a purpose to recognize the Indian title to the lands described in the Fort Laramie treaty, which may well have induced the Court of Claims to reach one conclusion in those cases and another in this. For example, the instructions to the commissioners for the Fort Laramie negotiations contained this direction:

"It is important, if practicable, to establish for each tribe some fixed boundaries within which they should stipulate generally to reside, and each should agree not to intrude within the limits assigned to another tribe without its consent." 71 Ct. Cls. 312.

Further in reporting the treaty, it was said:

"The laying off of the country into geographical, or rather national domains, I regard as a very important measure, inasmuch as it will take away a great cause of quarrel among themselves, and at the same time enable the Government to ascertain who are the depredators,

should depredations hereafter be committed." 71 Ct. Cls. 313.

Furthermore, the words of the Fort Laramie treaty are more apt to express recognition of Indian title than those of Box Elder. Article 5 says:

"The aforesaid Indian nations do hereby recognize and acknowledge the following tracts of country, included within the metes and boundaries hereinafter designated, as their respective territories, viz: . . ." 71 Ct. Cls. 315.

In consideration of the treaty stipulations the United States bound itself to furnish supplies and to protect the Indian nations against depredations by its citizens. Such distinctions may quite justifiably have led the Court of Claims to different conclusions than it reached from consideration of the Northwestern Shoshone treaty.[8]

Petitioners point out that the word "claim" or the phrase "country claimed" was often used on the frontier

---

[8] We note but consider unimportant, because this issue was not involved, casual references by this and other courts that the Shoshone treaties recognized Indian title in the Shoshones. *Shoshone Tribe* v. *United States*, 299 U. S. 476, 485; *United States* v. *Shoshone Tribe*, 304 U. S. 111, 113; *Shoshone Indians* v. *United States*, 85 Ct. Cls. 331, 335; *United States* v. *Board of Comm'rs*, 145 F. 2d 329.

We do not consider the references of the administrators in routine communications called for in the preparation of this case before the Court of Claims to the "Shoshoni Indian Reservation (Northwestern Band)" to the fact that the territory of the Shoshones "was recognized by the United States" or "set apart for the Shoshone Indians" of any more weight. Nothing in these statements shows that the attention of the administrators was focused on the problem of recognition or that they reflected a contemporaneous interpretation.

It does not seem important to determine whether the Court of Claims abused its discretion in refusing admission to such administrative letters written in 1939, relating to preparation for this suit, of maps of the territory. We have examined the tendered evidence. It was also seen by the Court of Claims and if it had been admitted it would have been merely cumulative and could not have changed the conclusion below.

to indicate title or right. We know this meaning in mining law and in entries for land patents. The meaning of the word or phrase depends upon its use. In these treaties it seems clearly to designate the boundaries over which the Indians asserted Indian title but that falls short of acknowledgment of such right by the United States.

Reliance is also placed by petitioners upon the Senate's amendment to the Treaty [9] as a limitation of the treaty's recognition of Indian title to the described lands. This limitation, petitioners argue, demonstrates that no other limitation was intended. Petitioners take the position that there was no need for this limitation "if the treaty recognized no rights." While such a limitation would not have been needed if the Senate of that day were positive, on weighing the issue as we now do, that the treaty was ineffective to give any additional color to Indian titles within or without the Mexican Cession, it is unlikely that the ratifying body could or did appraise the several possibilities which are now presented. The Senate was well acquainted with the complications of Mexican land titles in the Cession. A portion of the lands lay within the boundaries of the former Mexican state of Alta California. The Senate was familiar, too, with the legal position of Indian titles in the Shoshone country outside the Mexican Cession.[10] Such titles were subject to the same rules as similar titles in all Indian country. 4 Stat. 729. The

---

[9] "Nothing herein contained shall be construed or taken to admit any other or greater title or interest in the lands embraced within the territories described in said treaty in said tribes or bands of Indians than existed in them upon the acquisition of said territories from Mexico by the laws thereof."

[10] Spanish claims north of the 42nd parallel of latitude, then the northern line of Mexico, were ceded to the United States in 1821, Treaties and Other International Acts of the United States, Vol. 3, p. 3, and Art. 8; Russian claims south of 54°40' north latitude in 1824, op. cit. p. 151 and Art. 3; and the British claims south of north latitude 49° in 1846, op. cit., Vol. 5, p. 3 and Art. III.

status of Indian titles within the Mexican Cession of 1848, however, had not then been judicially determined.[11]   The treaty of Guadalupe Hidalgo guaranteed the property rights of Mexicans in the Cession.[12]   Controversies over these rights had caused the rejection by the Senate of Article X of the treaty as submitted.[13]   The rejection was followed by the protocol of Queretaro of 1848 in which our commissioners for the exchange of ratifications undertook to make explanation to Mexico of the rejection of Article X.[14]   The protocol itself was a subject of House and Senate debate and of extensive diplomatic correspondence.[15] There had been, also, the Act of March 3, 1851, 9 Stat. 631,

---

[11] Barker v. Harvey, 181 U. S. 481, Cramer v. United States, 261 U. S. 219; United States v. Santa Fe Pacific R. Co., 314 U. S. 339.

[12] 5 Treaties op. cit., supra, 207, Art. VIII and IX.   United States v. O'Donnell, 303 U. S. 501, 504.

[13] Treaties and Other International Acts of the United States, Vol. 5, pp. 242, 245:

"ARTICLE X.   All grants of land made by the Mexican Government or by the competent authorities, in territories previously appertaining to Mexico, and remaining for the future within the limits of the United States, shall be respected as valid, to the same extent that the same grants would be valid, if the said territories had remained within the limits of Mexico. . . ."

[14] The explanation in the second article of the protocol was as follows:

"SECOND.  The American Government by suppressing the Xth article of the Treaty of Guadalupe did not in any way intend to annul the grants of lands made by Mexico in the ceded territories.  These grants, notwithstanding the suppression of the article of the Treaty, preserve the legal value which they may possess; and the grantees may cause their legitimate titles to be acknowledged before the American tribunals.

"Conformably to the law of the United States, legitimate titles to every description of property personal and real, existing in the ceded territories, are those which were legitimate titles under the Mexican law in California and New Mexico up to the 13th of May 1846, and in Texas up to the 2d March 1836."  Treaties, id., vol. 5, p. 381.

[15] See Treaties, id., vol. 5, pp. 380–406, particularly p. 387.

to settle the private land claims in California, after its admission as a state. Litigation over land titles in the Mexican Cession had already reached this Court. *United States* v. *Nye,* 21 How. 408; *United States* v. *Bassett,* 21 How. 412; *United States* v. *Rose,* 23 How. 262. We do not think that the amendment indicates more than an intention to be sure the new treaty did not add to the complexities of the Mexican Cession title situation. Cf. *Barker* v. *Harvey,* 181 U. S. 481, 491; *United States* v. *Title Ins. Co.,* 265 U. S. 472, 484.

Petitioners suggest that in the construction of Indian treaties we, as a self-respecting nation, hesitate to construe language, which is selected by us as guardian of the Indians, to our ward's prejudice. "All doubts," say petitioners, "must be resolved in their [the Indians'] favor." Mr. Justice McLean, concurring in *Worcester* v. *Georgia,* 6 Pet. 515 at 582, said, "The language used in treaties with the Indians should never be construed to their prejudice." But the context shows that the Justice meant no more than that the language should be construed in accordance with the tenor of the treaty.[16] That, we think, is the rule which this Court has applied consistently to Indian treaties. We attempt to determine what the parties meant by the treaty. We stop short of varying its terms to meet alleged injustices. Such generosity, if any may be called for in the relations between the United States and the Indians, is for the Congress.[17]

---

[16] This is the meaning of the other cases which are cited by petitioners upon this point, *Jones* v. *Meehan,* 175 U. S. 1, 10–12; *United States* v. *Winans,* 198 U. S. 371, 380; *Marlin* v. *Lewallen,* 276 U. S. 58, 64; *United States* v. *Payne,* 264 U. S. 446, 448–49; *Northern Pacific R. Co.* v. *United States,* 227 U. S. 355, 366; *Seufert Bros. Co.* v. *United States,* 249 U. S. 194, 198; *United States* v. *Shoshone Tribe,* 304 U. S. 111, 116; see also *Tulee* v. *Washington,* 315 U. S. 681, 684.

[17] *United States* v. *Choctaw Nation,* 179 U. S. 494, 534–36; *Choctaw Nation* v. *United States,* 318 U. S. 423, 432.

It seems to us clear from the circumstances leading up to and following the execution of the Box Elder Treaty that the parties did not intend to recognize or acknowledge by that treaty the Indian title to the lands in question. Whether the lands were in fact held by the Shoshones by Indian title from occupancy or otherwise or what rights flow to the Indians from such title is not involved. Since the rights, if any the Shoshones have, did not arise under or grow out of the Box Elder treaty, no recovery may be had under the jurisdictional act.

*Affirmed.*

MR. JUSTICE ROBERTS is of the view that the judgment should be reversed.

MR. JUSTICE JACKSON, concurring.

MR. JUSTICE BLACK and I think it may be desirable to state some of the difficulties which underlie efforts to leave such an Indian grievance as this to settlement by a lawsuit.

It is hard to see how any judicial decision under such a jurisdictional act can much advance solution of the problem of the Shoshones. Any judgment that we may render gives to these Indians neither their lands nor money. The jurisdictional act provides that the proceeds above attorneys' fees shall "be deposited in the Treasury of the United States to the credit of the Indians" at 4 per cent interest and "shall be subject to appropriation by Congress only for the health, education, and industrial advancement of said Indians." The only cash payment is attorneys' fees. Section 7 provides that the Court of Claims shall determine a reasonable fee, not to exceed 10 per cent of the recovery, together with expenses, to be paid to the attorneys for the Northwestern Bands out of the sums found due. After counsel are thus paid, not a cent is put into the reach of the Indians; all that is done for them by a judgment is to earmark some funds in the

Treasury from which Congress may as it sees fit from time to time make appropriations "for the health, education, and industrial advancement of said Indians." Congress could do this, of course, without any judgment or earmarking of funds, as it often has done. Congress, even after judgment, still must decide the amount and times of payment to the Indians according to their needs.

We would not be second to any other in recognizing that—judgment or no judgment—a moral obligation of a high order rests upon this country to provide for decent shelter, clothing, education, and industrial advancement of the Indian. Nothing is gained by dwelling upon the unhappy conflicts that have prevailed between the Shoshones and the whites—conflicts which sometimes leaves one in doubt which side could make the better claim to be civilized. The generation of Indians who suffered the privations, indignities, and brutalities of the westward march of the whites have gone to the Happy Hunting Ground, and nothing that we can do can square the account with them. Whatever survives is a moral obligation resting on the descendants of the whites to do for the descendants of the Indians what in the conditions of this twentieth century is the decent thing.

It is most unfortunate to try to measure this moral duty in terms of legal obligations and ask the Court to spell out Indian legal rights from written instruments made and probably broken long ago and to put our moral duty in figures as legal damages. The Indian problem is essentially a sociological problem, not a legal one. We can make only a pretense of adjudication of such claims, and that only by indulging the most unrealistic and fictional assumptions.

Here we are asked to go back over three quarters of a century to spell out the meaning of a most ambiguous writing made in 1863. One of the parties did not keep, or know how to keep, written records of negotiations.

Written evidence bearing on intention is only that which the whites chose to make. It does not take a particularly discerning eye to see that these records, written usually by Indian agents, are quite apt to speak well of the writer's virtue and good intention. Evidence from the memory of man is no longer available. Even if both parties to these agreements were of our own stock, we being a record-keeping people, a court would still have the gravest difficulty determining what their motives and intentions and meanings were. Statutes of limitations cut off most such inquiries, not because a claim becomes less just the longer it is denied, but because another policy intervenes—the policy to leave in repose matters which can no longer be the subject of intelligent adjudication.

Even if the handicap of time could be overcome, we could not satisfactorily apply legal techniques to interpretation of this treaty. The Indian parties to the treaty were a band of simple, relatively peaceful, and extremely primitive men. The population of the band was only about 1,500, and the territories claimed to have been occupied as their home consisted of over 15,000,000 acres of land in Idaho, Utah, and Nevada—about 10,000 acres for every individual in the band. Of course so few could not patrol and defend so vast a territory against inroads by the more aggressive and efficient whites. The white was a better killer. The game disappeared, the lands were not productive, and in peace the Indians became destitute. Desperation stimulated or perhaps produced predatory tendencies and they began to fall upon the overland caravans and to steal and rob. The whites brought forth their armies and reduced the Indians to submission. Then the whites "negotiated" a treaty.

We realize that for over a century it has been a judicial practice to construe these "agreements" with Indians, as if they were contracts between white men. In some cases, where the provisions are simple and definite and deal with

concrete lands or matters, this may be practicable. But despite antiquity of the custom, to apply the litigation process to such a problem as we have here seems far-fetched. The most elemental condition of a bargain was not present, for there was nothing like equality of bargaining power. On one side were dominant, powerful, shrewd, and educated whites, who knew exactly what they wanted. On the other side were destitute, illiterate Indians who primarily wanted to be let alone and who wanted by some means to continue to live their own accustomed lives. Here we are asked to decide whether their intent was to relinquish titles or make reservations of titles or recognition of titles. The Indian parties did not know what titles were, had no such concept as that of individual land title, and had no sense of property in land. Here we are asked to attribute legal meanings to subscribers of a written instrument who had no written language of their own in which to express any meaning. We doubt if any interpreter could intelligently translate the contents of a writing that deals with the property concept, for the Indians did not have a word for it. People do not have words to fit ideas that have never occurred to them. Ownership meant no more to them than to roam the land as a great common, and to possess and enjoy it in the same way that they possessed and enjoyed sunlight and the west wind and the feel of spring in the air. Acquisitiveness, which develops a law of real property, is an accomplishment only of the "civilized."

Of course the Indians may have had some vague idea that thereafter they were to stay off certain lands and the white men in return were to stay off certain other land. But we do not think it is possible now to reduce such a nebulous accord to terms of common-law contract and conveyancing. The treaty was a political document. It was intended to pacify the Indians and to let the whites travel in peace a route they somehow were going to travel anyway.

How should we turn into money's worth the rights, if any, of which the Indians have been deprived? Should we measure it in terms of what was lost to a people who needed 10,000 acres apiece to sustain themselves through hunting and nomadic living, who had no system or standard of exchange, and whose representatives in making the treaty appear to have been softened for the job by gifts of blankets and trinkets? Should we measure it in terms of what was gained to our people, who sustain themselves in large numbers on few acres by greater efficiency and utilization? Of course amends can be made only to progeny in terms of their present needs as the jurisdictional Act recognizes will ultimately be done. The Indians' grievance calls for sympathetic, intelligent, and generous help in developing the latent talents and aspirations of the living generation, and there is little enlightenment for that task from endless and pointless lawsuits over the negotiation of generations long gone to their rest.

We agree with MR. JUSTICE REED that no legal rights are today to be recognized in the Shoshones by reason of this treaty. We agree with MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY as to their moral deserts. We do not mean to leave the impression that the two have any relation to each other. The finding that the treaty creates no legal obligations does not restrict Congress from such appropriations as its judgment dictates "for the health, education, and industrial advancement of said Indians," which is the position in which Congress would find itself if we found that it did create legal obligations and tried to put a value on them.

MR. JUSTICE DOUGLAS, dissenting.

I think the claims which these Indians assert are claims "arising under or growing out of the treaty of July 30, 1863."

He who comes to my abode and bargains for free transit or a right of way across the land on which I live and which I proclaim to be my own certainly recognizes that I have a claim to it. That and more was done here. Routes of travel through this Shoshone country, the establishment of military agricultural settlements and military posts, the maintenance of ferries over the rivers, the erection of houses and settlements, the location, construction, and operation of a railroad, the maintenance of telegraph and overland stage lines were all negotiated. These provisions alone constitute plain recognition by the United States that it was dealing with people who had the power to grant these rights of travel and settlement. The United States, of course, did not need to follow that course. It could have invaded this Indian country and extinguished Indian title by the sword or by appropriation. *United States* v. *Santa Fe Pacific R. Co.*, 314 U. S. 339, 347, and cases cited. But it did not choose that course. It chose to negotiate a treaty. And through the medium of the treaty it obtained from these Indians rights of way, rights to settle, rights of transit. It was stated in *Worcester* v. *Georgia*, 6 Pet. 515, 556, that "The acceptance of these cessions is an acknowledgment of the right of the Cherokees to make or withhold them." That is good law. It is as applicable here as it was in that early case. There, to be sure, lands had been specifically set apart for the Cherokees. But that is not a material difference. Indian title is the right to occupancy based on aboriginal possession. *United States* v. *Santa Fe Pacific R. Co., supra.* It has been the policy of the United States from the beginning to respect that right of occupancy. *Id.*, p. 345. As stated in *Mitchel* v. *United States,* 9 Pet. 711, 746, the Indian "right of occupancy is considered as sacred as the fee simple of the whites." Thus we may not say that because these Indians had only Indian title this case can

be distinguished from *Worcester* v. *Georgia, supra.* When the United States obtained these cessions it acknowledged whatever claim to the land these Indians had. The Indians ask no more now.

Moreover, the Senate in ratifying the treaty made clear that it construed the treaty as recognizing the title or claim of these Indians to this land. The amendment added in the Senate provided: "Nothing herein contained shall be construed or taken to admit any other or greater title or interest in the lands embraced within the territories described in said treaty in said tribes or bands of Indians than existed in them upon the acquisition of said territories from Mexico by the laws thereof." That should put beyond dispute that the Senate understood the treaty to accord recognition of the title which the Indians had under Mexican law. To say it gives no recognition to any claim is to erase this provision from the treaty.

But if there is still any doubt as to the meaning of the treaty it should be wholly removed by another of its provisions. The treaty stated that "The country claimed by Pokatello, for himself and his people, is bounded on the west by Raft River and on the east by the Porteneuf Mountains."

That is now brushed aside as irrelevant. But we should remember that no counsel sat at the elbow of Pokatello when the treaty was drafted. It was written in a language foreign to him. He was not a conveyancer. He was not cognizant of distinctions in title. He neither had nor gave deeds to his land. There was no recording office. But he knew the land where he lived and for which he would fight. If the standards of the frontier are to govern, his assertion of ownership and its recognition by the United States could hardly have been plainer.

We should remember the admonition in *Jones* v. *Meehan,* 175 U. S. 1, 11, that in construing a treaty between the United States and an Indian tribe it must always be

borne in mind "that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians."

When the standard is not observed, what these Indians did not lose to the railroads and to the land companies they lose in the fine web of legal niceties.

As stated by the Attorneys General of Idaho and Utah who appear here as *amici curiae:* "The result is that a peaceful and friendly people, lulled into a sense of security by the proffers of the United States of peace and amity, have been reduced from a nation able to wrest their living from their primitive ancestral home to a nondescript, homeless, and poverty-stricken aggregation of bands of Indians, without the means to compete in the modern civilization which had disseised them. Until the treaty with petitioners, petitioners were so strong and formidable that the trouble and expense of taking their lands by war—leaving out of account the dishonor that would have been involved in proceeding against a nation which had given no cause for war—would have far outweighed the expense of settling with them for their lands at whatever the cost in money. But the United States did neither. Congress

felt it could not at that time afford to extinguish petitioners' title by purchase. Consequently, for a meager consideration, the petitioners granted respondent certain valuable rights in those lands. For respondent, under these circumstances, to attempt to deny petitioners' title is unworthy of our country. The faith of this nation having been pledged in the treaties, the honor of the nation demands, and the jurisdictional act requires, that these long-unsettled grievances be settled by this court in simple justice to a downtrodden people."

The story has been told before. Chester Fee, Chief Joseph (1936); Howard Fast, The Last Frontier (1944).

MR. JUSTICE FRANKFURTER and MR. JUSTICE MURPHY join in this dissent.

MR. JUSTICE MURPHY, dissenting.

It is a well-settled rule that in the interpretation of Indian treaties all ambiguities are to be resolved in favor of the Indians. *Worcester* v. *Georgia,* 6 Pet. 515, 582; *Winters* v. *United States,* 207 U. S. 564, 576; *Carpenter* v. *Shaw,* 280 U. S. 363, 367. While this principle does not justify ignoring the plain meaning of words in order to prevent what appears to be an injustice to the Indians, it does mean that a court is bound to give to doubtful expressions that meaning least prejudicial to the interests of the Indians, giving full weight to the conditions under which the treaty was drawn. The application of this principle to the facts of this case makes manifest the error of the Court of Claims.

The issue here centers about the meaning of the Box Elder Treaty of July 30, 1863, 13 Stat. 663, entered into between the United States and the Northwestern Bands of Shoshone Indians. Did the United States by that treaty acknowledge or recognize the claim of the Indians to the land in question so as to make it a claim "arising under or growing out of" the treaty for purposes of the

jurisdictional act of February 28, 1929, 45 Stat. 1407? An affirmative answer to this question is dictated by both the treaty provisions and the circumstances surrounding the making of the treaty.

1. *Events preceding the Box Elder Treaty.* The great westward surge of the white men from 1849 to 1863 through the country claimed by the various Shoshone tribes aroused resentment and hostility among the Indians. Game was driven away and vegetation destroyed, forcing the Indians to steal or starve. Telegraph and overland daily mail lines were established through their territory in complete disregard of any rights they might have. The Government did little or nothing to supply the Indians with food or supplies during this period. White emigrants and the Government were caused considerable trouble by depredations and warlike acts of these oppressed Indians. Some agreement whereby white emigrants could travel and the Government could maintain a communication system through the Shoshone area was imperative.

Little was done before 1861, when the Commissioner of Indian Affairs recommended that a treaty be negotiated with the Shoshone Indians which would grant them annuities "in consideration of a right-of-way across their country." In the same year the Superintendent of Indian Affairs for the Utah Territory also recommended the negotiation of a treaty, stating that the Shoshones "express their willingness to cede to the United States all the lands they claim in this territory," with certain reservations.

In February, 1862, the Secretary of the Interior in a letter to the chairman of the House Committee on Indian Affairs acknowledged that the lands were "owned by the Indians" but reported that little was fit for cultivation and would probably not be "required for settlement for many years." He thus did not recommend the purchase of the land. In light of this letter, the House Committee on Indian Affairs recommended to Congress that it au-

thorize the negotiation of a treaty for passageways over the land claimed by the Shoshones and not try to purchase the land.

Accordingly on July 5, 1862, Congress authorized the appointment of a treaty commission to negotiate such a treaty. 12 Stat. 512, 529. On July 22 the Commissioner of Indian Affairs instructed the treaty commissioners who had been appointed that the Government did not have sufficient knowledge to state definitely the boundaries of the country inhabited and claimed by the Shoshones but that it was understood that they inhabited "the country in the northern part of Utah and eastern portion of Washington Territories, through which lies the route of the overland mail, and the emigrant route through Utah and into Washington Territory and it is mainly to secure the safety of the travel along these routes that a treaty is desirable." He further told them that it was not expected that the treaty would be negotiated "with a view to the extinguishment of the Indian title to the land." They were told that the United States' assurances of amicable relations and the contemplated payment of $20,000 in annuities should enable them to procure from the Indians an agreement for the security of the overland mail and emigrant routes, in addition to a "definite acknowledgment as well of the boundaries of the entire country they claim, as of the limits within which they will confine themselves."

Thus prior to the actual negotiation of the treaty, the United States recognized that the Shoshone tribes claimed and inhabited certain territory, the exact boundaries of which were uncertain. The fact that the United States thought it necessary to make a treaty concerning rights of way and the fact that the United States expressly did not desire to negotiate "with a view to the extinguishment of the Indian title to the land" strongly indicate that the United States considered the Indians as the owners of this

ill-defined area of land. The securing of rights of way, which was the main purpose of the treaty, would have been a needless formality had title to the underlying land been thought to be in the name of the United States. And the securing of an acknowledgment of the boundaries of the land claimed by the Shoshones, which was a subsidiary purpose of the treaty, would likewise have been unnecessary if the United States considered itself the owner of all the land. The stage was thus set for a delineation of the Shoshone land to which the United States was prepared to acknowledge Indian title.

2. *The negotiations for and the contents of the Box Elder Treaty.* The treaty commissioners found it impossible to assemble all the Shoshone tribes at one time. They thus negotiated five separate treaties with the five Shoshone Nations. They met first with the Eastern Shoshones at Ft. Bridger, Wyoming, where they negotiated the treaty of July 2, 1863, 18 Stat. 685. This treaty pledged peace between the United States and the Indians and pledged the United States to pay annual annuities. The Shoshones in turn agreed that routes of travel through "Shoshone country" should remain forever free and safe for the use of the United States and its emigrants and travellers. They also agreed that the United States might establish military agricultural establishments and military posts along said routes, maintain ferries over rivers, erect houses and settlements wherever necessary for the comfort of the travellers, operate and maintain existing telegraph and overland stage coach lines, and operate a transcontinental railway "through any portion of the country claimed by" the Shoshones. The treaty further set forth a description of "the Shoshonee country, as defined and described by said nation," leaving the western boundary undefined since there were no Shoshones present from that area.

On July 30, 1863, the commissioners met with the Northwestern Bands of Shoshone Indians at Box Elder, Utah.

The resulting treaty also stipulated for peace and friend-ship and then incorporated by reference all the pertinent provisions of the Ft. Bridger Treaty. The Northwestern Bands thus granted the same rights of way and easements over their lands as the Eastern Bands had granted. The Box Elder Treaty did not purport to describe all the land of the Northwestern Bands, but only the "country claimed by Pokatello [one of their chiefs] for himself and his peo-ple." This area was described as being bounded on the west by the Raft River and on the east by the Porteneuf Mountains.

Similar treaties were entered into with the Western Shoshones on October 1, 1863, the Shoshonee-Goship Bands on October 12, 1863, and the Mixed Bands of Sho-shone and Bannock Indians on October 14, 1863. All these treaties were substantially the same insofar as the granting of rights of way and easements were concerned. And each of them set forth "the boundaries of the country claimed and occupied by said bands."

Thus by these five treaties the United States secured (a) freedom of travel and communication through the Shoshone country and (b) definite acknowledgment of the areas claimed by the Shoshones. While the Box Elder Treaty did not define the boundaries of the Northwestern Shoshone lands completely, reference to and collocation of the territorial descriptions in the other four treaties, as well as reference to the map prepared at the time by the chairman of the treaty commission, supply the territorial boundaries of these lands.

The very acceptance in the Box Elder Treaty of these rights of way and easements constituted a recognition and acknowledgment by the United States that the North-western Bands had title to the land claimed. *Worcester v. Georgia,* 6 Pet. 515, 556; *Fort Berthold Indians v. United States,* 71 Ct. Cls. 308, 332. Such recognition and acknowl-edgment need not be indicated by any particular word or phrase. They may be implied as well as expressed.

That is the case here. The Box Elder Treaty and the four other treaties would have been meaningless had the United States not thereby recognized the Indian title to the land claimed. Without such title, the Indians would have lacked power to bargain concerning the right to travel and communicate over the land. Recognition of this power to bargain and acceptance of the fruits of that bargaining implied recognition of the underlying Indian title to the land. Otherwise there would have been no reason for the United States bothering to negotiate. Unilateral assertion of rights would have been resorted to had the United States not recognized Indian title to these lands. This is true whether the Indians held title based on aboriginal possession or whether they held lands specifically set aside for them. It is likewise immaterial that the main purpose of the treaties was to secure rights in the land rather than to acknowledge or secure title. The securing of those rights necessarily presupposes Indian title and necessarily recognizes such title.

Thus by its action in negotiating for and securing rights of passage and communication, the United States indicated its recognition and acknowledgment of Indian title to the land. The descriptions of the lands claimed by the various tribes were inserted merely to give the United States knowledge of the precise boundaries to the land held by the Indians. The fact that these treaties and the Box Elder Treaty in particular speak in terms of land "claimed" by the Indians does not negate recognition of title to the land so claimed. In the context of these treaties and in light of the ignorance of the Indians of legal niceties, the term "claim" need not be taken to mean bare assertion to title. It must be remembered that these Indians held title by aboriginal possession and that the United States was in no position to bargain as to the scope of the land so held. A bona fide Indian claim of this type is synonymous with ownership unless it conflicts with some other ownership or unless such an Indian title is

unrecognized in law. Here, however, the United States did recognize this type of ownership and was anxious merely to ascertain the scope of the land so claimed or owned. The placing of these descriptions in a bilateral treaty is at least consistent with the conclusion that the United States recognized title to the extent of the lands claimed. And under the rule that ambiguities are to be resolved in favor of the Indians, we must adopt that conclusion.

3. *Events subsequent to the Box Elder Treaty.* Any doubt as to whether the United States by these treaties recognized and acknowledged Indian title to the land claimed is removed by actions and statements of the Government subsequent to the making of these treaties.

The Senate ratified each of the treaties. To four of them, including the Box Elder Treaty, the Senate added an amendment providing that nothing in the treaty should be construed to admit "any other or greater title or interest in the lands embraced within the territories described in said treaty in said tribes or bands of Indians than existed in them upon the acquisition of said territories from Mexico by the laws thereof." See 13 Stat. 664. Whatever may have been the complexities of the Mexican cession title situation as described in the opinion of this Court, the Senate by this amendment clearly indicated that it understood each treaty to constitute a recognition of Indian title to the land claimed, at least as to lands outside the Mexican cession. Had the Senate been under the impression that no title rights were involved in the treaties it would have been meaningless to add this amendment. Resolving any doubts on this score in favor of the Indians compels us to interpret this amendment as another recognition of Indian title.

In 1863 the Commissioner of Indian Affairs recommended that further treaties with the Shoshones be nego-

tiated to extinguish their title to the soil. And Congress in 1865 authorized the President to enter into treaties with Indians in the Utah Territory for the surrender to the United States of their possessory right to all agricultural and mineral land and for their segregation on reservations. 13 Stat. 432. Accordingly a treaty was made with the Eastern Shoshones in 1868 whereby they gave up the territory claimed by them in the Ft. Bridger Treaty in exchange for other lands. 15 Stat. 673. Here again is clear proof that the United States considered title to the land to belong to the Indians, making even more compelling the conclusion that the 1863 treaties constituted a necessary recognition of that title.

And as late as 1934 the Secretary of the Interior admitted that the territory of the Shoshones "was recognized by the United States as belonging to the various bands of Shoshone Indians" by the 1863 treaties and that the "Government recognized all the land as belonging to the Northwestern bands of Shoshones." Such statements are more than justified by the history and contents of the treaties.

One final matter remains. It is said that any money recovered by the Indians in this suit would have to be deposited in the Treasury of the United States, subject to appropriation by Congress for their benefit, and that the only possible cash payment involves attorney fees. That may be true. But it does not justify ignoring the rights of the Shoshone Indians recognized under solemn treaties entered into with the United States. It does not command us to overthrow the moral obligation of the United States to fulfill its treaty obligations. And it does not warrant the application of narrow principles of construction to the injury of the Indians' interests. If Congress desires to place in the Treasury any money that might be recovered by the Indians in this suit that is the business of Congress, not ours. Our function here is at an end

when we have determined if the Northwestern Bands have any claim "arising under or growing out of" the Box Elder Treaty. Because I believe they have such a claim I would reverse the judgment below.

MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS concur in this opinion.