Littleton, Judge,
delivered the opinion of the court:
Section 1 of the Jurisdictional Act (45 Stat. 1407) provides as follows:
That jurisdiction be, and hereby is, conferred upon the Court of Claims, notwithstanding lapse of time or statutes of limitations, to hear, adjudicate, and render judgment in any and all claims which the northwestern bands of Shoshone Indians may have against the United States arising under or' growing out of the treaty of July 2, 1863 (18 Stat. 685, 2 Kappler 848); treaty of July 30, 1863 (13 Stat. 663, 2 Kappler 850); Act of Congress approved December 15, 1874 (18 Stat. 291), and any subsequent treaty Act of Congress, or Executive order, which claims have not heretofore been determined and adjudicated on their merits by the Court of Claims or the Supreme Court of the United States.
*681 The treaty of July 2, 1863, mentioned above, was witl the Eastern bands of the Shoshone Nation, and is set fortl, in finding 9. The treaty of July 30, 1863, was with plain» tiff bands of the Shoshone Nation, and is set forth in finding 10. The act of Congress approved December 15, 1874 (18 Stat. 291, 292), was an act ratifying an agreement of September 26,1872, with the Eastern bands of the Shoshone Indians ceding to the United States a portion of a reservation in the Wind River Valley of Wyoming set apart for the exclusive use and occupancy of said Eastern bands by the treaty with them of July 3, 1868. The plaintiff bands were not parties to the treaty of 1868 or the agreement of 1872. See 85 C. Cls. 331. The act of December 15, 1874, had no reference to the treaty of July 30, 1863, with plaintiff bands and did not affect that treaty, or any of the territory claimed in this proceeding. There were no treaties or acts of Congress subsequent to the treaty with plaintiff bands of July 30, 1863, other than the act of February 23, 1865, 13 Stat. 432, set forth in finding 22, which made reference to any part of the territory in which was located any of the land for which plaintiff bands herein make claim for compensation.
In order to recover in this case, plaintiff bands must show that in the treaty with them of July 30, 1863, or in the treaty of July 2, 1863, with the Eastern Bands of the Shoshone Nation, which was made a part of the treaty with plaintiff bands, the United States, acting through the appropriate officials of the Department of Indian Affairs, the treaty commissioners, who negotiated and made the treaty with these bands, the President, and the Senate expressly or by necessary implication recognized, acknowledged, and conceded under the terms of these treaties the exclusive possessory use and occupancy right or title of plaintiff bands of the Shoshone Indians as against the United States in the whole or some part of the territory of 15,643,000 acres of land for which they now make claim for compensation as for a taking in violation of that treaty of July 30,1863.
The question whether under the Mexican laws at the time of the Mexican Cession of 1848 plaintiff bands had use *682 and occupancy rights — that is, “Indian title” — to certain of the land involved in this case based upon aboriginal possession or occupancy to the exclusion of other Indian tribes has been decided adversely to the defendant’s contention in this case in United States of America, as Guardian of the Indians of the Tribe of Hualpai in the State of Arizona v. Santa Fe Pacific Railroad Co., 314 U. S. 339, decided December 8, 1941. That was a suit by the United States, as guardian of the Hualpai (Walapais) Indians, for an accounting by the Railroad Company for all rents, issues and profits derived from the leasing, renting, or use of the lands subject to right of occupancy by the Indians, and the court said:
Basic to the present causes of action is the theory that the lands in question were the ancestral home of the Walapais, that such occupancy constituted “Indian title” within the meaning of section 2 of the 1866 Act, which the United States agreed to extinguish, and that in absence of such extinguishment the grant to the railroad “conveyed the fee subject to this right of occupancy.” Buttz v. Northern Pacific Railroad, 119 U. S. 55, 66. * * *
Occupancy necessary to establish aboriginal possession is a question of fact to be determined as any other question of fact. If it were established as a fact that the lands in question were, or were included in, the ancestral home of the Walapais in the sense that they constituted definable territory occupied exclusively by the Walapais (as distinguished from lands wandered over by many tribes), then the Walapais had “Indian title” which unless extinguished survived the railroad grant of 1866. Buttz v. Northern Pacific Railroad, supra.
“Unquestionably it has been the policy of the Federal Government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States.” Cramer v. United States, 261 U. S. 219, 227. * * * Whatever may have been the rights of the Walapais under Spanish law, the Cramer case assumed that lands within the Mexican Cession were not excepted from the policy to respect Indian right of occupancy. * * *
Plaintiff bands contend that in their treaty of 1863 the United States recognized, acknowledged, and conceded their *683 aboriginal use and occupancy right or title to the territory within and without the Mexican Cession and that no action of the United States has ever extinguished this occupancy right or title.
The defendant contends that there was no such acknowl-edgement in this treaty by the United States of the exclusive use and occupancy title of plaintiff bands to any portion of the lands claimed by them as against the Government, but that the treaty was intended to be, and was, a treaty of peace and amity with stipulations for annuities in goods and provisions for the Indians, parties to the treaties, in return for such peace and amity by the ending of attacks upon settlers and depredations committed in the territory inhabited and roamed over by them, and upon the white emigrants passing through such country on the overland trails to California, Oregon, and the mining regions of Idaho and Montana.
We are of opinion from a careful consideration of the treaties of July 2 and July 30, 1863, in the light of the facts and circumstances disclosed by the record and the history of the times before and after the treaties with plaintiff bands and other bands of the Shoshone nation or tribe of Indians, that the defendant’s contentions are correct and that the United States did not in the treaty with plaintiff bands recognize or acknowledge the use and occupancy right or title in plaintiff bands as against the Government to the whole or any portion of the territory now claimed by them. On the contrary, the record compels the conclusion that the United States has ever exercised dominion and complete ownership over the territory for which plaintiff bands now make claim. No subsequent treaty or agreement was ever made with plaintiff bands.
At the outset it should be stated that the fact that plaintiff bands may have inhabited, claimed, possessed, and occupied the whole or a part of the territory of 15,643,000 acres of land now claimed by them to the exclusion of other tribes of Indians, and with the recognition of the other tribes, would not entitle plaintiff bands here successfully to maintain the claim involved in this suit or authorize the court to enter judgment thereon based on immemorial or aborigi- *684 rial possession and occupancy. Hayt, Administrator, v. United States, 38 C. Cls. 455, 462; Duwamish et al. Tribes of Indians v. United States, 79 C. Cls. 530, 599, 600. Cf. Coos Bay Indian Tribes et al. v. United States, 87 C. Cls. 143; The Wichita and Affiliated Bands of Indians in Oklahoma et al. v. United States, 89 C. Cls. 378, 420. The jurisdictional act does not embrace such a claim independent of the treaty of July 30, 1863; therefore, unless the defendant by this treaty recognized and acknowledged that the plaintiff bands had exclusive possessory use and occupancy title, they are not entitled to recover as for a taking by the United States. The fact that the treaties of July 2 with the Eastern bands and of July 30 with plaintiff bands did not contain any express provision or language with reference to the matter of extinguishment of any claim, right, title, or interest of the Indians in respect of the territory inhabited by them does not establish that, by the treaty, the United States recognized and acknowledged the existence of such right or title as against its own title. Without doubt the United States had the unquestioned right to exercise complete dominion and ownership of the territory in which plaintiff bands were found in and prior to 1863. In United States of America, as Guardian, etc., v. Santa Fe Pacific Railroad Co., supra, the court in referring to rights and title of Indian tribes based on aboriginal possession, use, and occupancy said—
Nor is it true, as respondent [Eailroad] urges, that a tribal claim to any particular lands must be based upon a treaty, statute, or other formal government action. As stated in the Cramer case, “The fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive.” 261 U. S. at 229.
In speaking with reference to the matter of extinguishment of Indian title, the court further said:
Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The manner, method, .and time of such extinguishment raise political, not justiciable issues. Buttz v. Northern Pacific Railroad, supra, p. 66. As stated by Chief Justice Marshall *685 in Johnson v. M’Intosh, supra, p. 586, “the exclusive right of the United States to extinguish” Indian title has never been doubted. And whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts. Beecher v. Wetherby, 95 U. S. 517, 525.
In and prior to 1850 the Government had practically no knowledge with reference to the Indians inhabiting the country which became southern Idaho, eastern Oregon, northern Nevada, and northern Utah or of any particular areas occupied by any particular tribes or bands, and knew very little as to tribal distinctions. From 1849 until 1863, when the five treaties mentioned in the findings were made with the different bands of Indians of the Shoshone nation or tribe, and subsequently, the Government Indian agents and superintendents of Indian Affairs in Washington and Utah territories, in which the States of Idaho, Nevada, Utah, and Wyoming now are located, acquired in their travels and contacts with the Indians some information as to the locations of various bands of these Indians and the area in which they lived and over which they roamed and hunted, but such information was general in character and indefinite as to boundaries of specific areas and, also, as to specific bands or individual Indians of specific tribes. The Utah' Superintendency of the Indian Department was located at Salt Lake and the agents and representatives of the Government at this superintendency made various trips among the Indians in that territory and westward, across what is now Nevada, in the vicinity of white settlements and along the overland trails to California, Oregon, and Idaho. The overland trail to California passed through the territory then occupied by the Eastern bands of Shoshones in what is now the southwestern portion of Wyoming and the northeast corner of Utah, through the territory occupied by plaintiff bands in what is now northeast Utah and southeast Idaho, through the territory occupied by the bands of Bannocks and Shoshones in northeast Idaho,, the Goship-Shoshone bands in western Utah below Salt Lake, and the Western bands of the Shoshones in northeast Nevada. The *686 main California trail came through southwest Wyoming over the mountains into northeast Utah north of Great Salt Lake and across that portion of Utah to Nevada and south, in Nevada, to the Humboldt River and along that river westward across that state to California.
The Shoshone Tribe of Indians and the various bands thereof, with a few exceptions hereinafter mentioned, desired to be and were peaceful and friendly to the whites and the Government. The Shoshone nation, or tribe, as such, has never made war upon the United States or the white settlers. The bands of Shoshone Indians inhabiting the territory which became northern and western Utah, southern Idaho and northeastern Nevada were poor; the territory in which they lived was mostly desert country, and there was only a sparse supply of game and food. The white emigrants and settlers during the period from 1849 to 1863 practically destroyed the source of livelihood of the Shoshone Band of Indians in this territory. The result of this was that a number of Indians of the Northwestern Bands, and perhaps some of the other bands, made attacks upon the white settlers and emigrants and committed depredations from time to time up to January 1863. The record shows that the Indian agents and some of the military representatives of the Government traveling through a portion of the territory in which these Indians were found gave the various Indians, as far as they were able so to do, some provisions and supplies as presents for the purpose of endeavoring to end these attacks and depredations. The agents found that all the Indians desired peace but they were strong in their protestations of the destruction of their means of livelihood and begged the Government agents to bring them presents and provisions. The agents found and from time to time reported to the Commissioner of Indian Affairs, and the Commissioner of Indian Affairs reported to Congress in his annual reports that these Indians were practically in a starving condition by reason of destruction of their source of food and that they were desirous of peace; that the attacks and depredations were doubtless being committed because of their condition and because they deemed it necessary to “steal or starve.” The record also shows *687 that the acts and conduct of certain unscrupulous whites also contributed to depredations by some of the Indians.
The Secretary of Interior and the Commissioner of Indian Affairs constantly recommended to Congress that some provision be made for assistance to and care of these Indians and that an appropriation be made and authority granted to negotiate treaties with them with a view to bringing about a permanent peace. It was not, however, until the enactment of a provision in the Appropriation Act of July .5, 1862, 12 Stat. 512, 529, that Congress made any appropriation for the assistance' of these Indians or authorized the negotiation of a treaty with them. In that act Congress appropriated $20,000 “for defraying the expenses of negotiating a treaty with the Shoshonees or Snake Indians, * * *, to be expended under the direction of the Secretary of the Interior.” The Secretary of the Interior had asked for $45,000, but Congress evidently thought that $20,000 would be sufficient to secure a treaty of peace. (See finding 4.)
Treaty commissioners were duly appointed and given instructions as set forth in finding 5. There was delay on the part of the commissioners in communicating to the Indians the intention of the Government to negotiate with them for peace and for payment of annuities, with the result that the attacks and depredations continued. Early in January 1863 the military authorities in the District of Utah learned of the encampment on Bear River, in the southeast corner of Idaho, of a large body of Indians from the Northwestern Bands and attacked this group of Indians in force and killed 224 of them. Thereafter, on or before June 1, 1863, the treaty commissioners, the chairman of which group was James Duane Doty, then superintendent of Indian Affairs for the Territory of Utah, began their work of negotiating with the Indians. The commissioners concluded that it would be best to meet and negotiate with the various bands of the Shoshone tribe in groups at different points for the reason that “The Shoshone bands are scattered over so vast an extent of country that it will be necessary for the commissioners to meet them at several points. The whole nation can never be assembled without *688 bringing them hundreds of miles.” Most of the bands of this tribe, other than the Eastern bands, were without horses or other means of transportation. After the making of these treaties and the furnishing of annuities in goods and provisions, the Indians remained peaceful and did not cause the United States or the white settlers any serious trouble.
The territory ceded to the United States by Mexico February 2,1848, under the treaty of Guadalupe Hidalgo, 9 Stat. 922, 929, added to the United States the area of what is now California, Nevada, Utah, Arizona, New Mexico, and a part of Colorado. Of the total of 15,643,000 acres of land claimed by plaintiff bands in this proceeding, 9,516,000 acres are located in Utah and Nevada within the Mexican Cession; the balance, or 6,067,000 acres, is located in southeast Idaho. Of the 25,197,000 acres described by the Eastern Bands of Shoshone Indians in the treaty with them of July 2, 1863, 7,552,000 acres are located in what is now northwest Colorado and northeast Utah, within the Mexican Cession, and the balance of 17,644,000 acres is located in what is now Wyoming and Idaho. All of the territory inhabited and described by the Goship-Shoshone Bands of Indians in the treaty with them of October 12. 1863, was located within the Mexican Cession, as was all the territory inhabited and described by the Western Bands of Shoshones in their treaty of October 1,1863. (18 Stat. 689.) All the territory which the treaty commissioners indicated as being inhabited by the Mixed Bands of Bannocks and Shoshones was entirely within what is now northeast Idaho and western Wyoming, no part of which is in the territory of the Mexican Cession.
In the Act of September 30, 1850 (9 Stat. 544, 558), Congress made an appropriation of $20,000 “to lenable the President to hold treaties with the various Indian tribes in the State of California.” (Cf. Act of June 5, 1850, 9 Stat. 437, and page 555, paragraph 12, of the Act of September 30, 1850, supra.)
Eighteen separate treaties were negotiated between March 19, 1851, and January 7, 1852, with some of the tribes and bands of Indians in California. These treaties with the Indians of California were submitted to the Senate by the *689 President on June 1, 1852, for action, and on July 8, 1852, the Senate by unanimous vote adopted a resolution on each treaty refusing to give its consent thereto. This action of the Senate was due to the fact that at that time it did not desire to recognize in the Indians any possessory use or occupancy right, title or interest as against the United States to any specific lands for the reason that the United States in acquiring the territory from Mexico succeeded to all rights in the soil, possessory and otherwise, and the Government regarded itself as the absolute and unqualified owner; that since the Indians had no possessory, occupancy, or other rights therein which were to be in any manner respected, the United States was under no obligation to treat with the Indians occupying the same for the extin-guishment of their title. The Executive Department and the Senate had that policy or attitude in mind in 1863 and 1864 when the treaty with plaintiff bands of the Shoshone Indians was negotiated, made, and ratified with the amendments hereinafter mentioned.
The treaty of July 30, 1863, with plaintiff bands and the treaty of July 2, 1863, with the Eastern Bands of the Shoshone Nation (findings 9 and 10) were ratified with the following amendment added by the Senate:
Nothing herein contained shall be construed or taken to admit anv other or xcreater title or interest in the lands embraced within the territories described in said treaty in said tribes or bands of Indians than existed in them upon the acquisition of said territories from Mexico by the laws thereof.
All the remaining treaties with the various bands of the Shoshone Tribe of Indians were ratified with like amendment March 7, 1864 (13 Stat. 663); however, action on the treaty with the Western Band of Shoshone Indians was reconsidered by the Senate on the same day and final action thereon was taken on June 26,1866, more than two years later, when the same was ratified without amendment, other than the filling in of the blank space therein as to the amount of the annuity of $5,000 per annum for twenty years. Why the amendment above quoted, which was added to the other treaties, was first added to the Western Shoshone treaty *690 but finally left out when the treaty was subsequently ratified does not appear; but we think that has noi important bearing upon the question of rights of plaintiff bands under their treaty. A subsequent change of attitude or policy toward these Indians would not, without more, constitute a recognition or acknowlédgment of title by a prior treaty which did not disclose such an acknowledgment. In view of the position thus taken by the United States, we think it cannot be said that the treaty with plaintiff bands recognized and acknowledged any right, title, or interest in them to the territory which they may have occupied or to which they now make claim. Although the plaintiff bands, insofar as other tribes were concerned, may have exclusively occupied and used all or a portion of the territory involved in their present1 claim "as- their aboriginal home (and the record is sufficient to show that they did), they are not entitled to recover' for the reason that the jurisdictional act only authorizes this court to consider, adjudicate, and render judgment on a claim “arising under or growing out of the treaty” with them. Such a claim must be one that is within the terms of and supported by the provisions of the treaty. Aboriginal occupancy and use is not such a claim. The record shows and we have found as a fact that the United States has never recognized, either at the time the treaty of July 30 was made, or subsequently, a right of exclusive occupancy in plaintiff bands to the territory claimed by them but that it has ever exercised complete dominion over the territory, and this is one method, or manner, so far as the present authority of the court to adjudicate is concerned, of extinguishing Indian title. United States v. Santa Fe Pacific R. R. Co., supra.
Moreover, in addition to what has hereinabove been said, the facts disclosed by the official records and communications of the Government show that it was not the intention of the Executive Department of the Government at the time of making the treaties with the Shoshone Indians in 1863 to stipulate and agree in such treaties either in favor of or against any use or occupancy claim of the Indians. The treaties were intended to be, and we think they are, treaties of peace and amity because the Government had very little *691 reliable information as to the territory actually occupied by these Indians. The treaty commissioners were therefore given specific instructions, among others, not to undertake negotiations with the view to extinguishment of any Indian title to land. We think the effect of these instructions, together with others which followed (finding 6), was that the treaty commissioners were not to stipulate with reference to the recognition and acknowledgment on the part of the Government of any exclusive use and occupancy title of the Indians to the land. Judging by what was done, we think the treaty commissioners so understood their instructions. The commissioners therefore simply wrote into the various treaties the statements made by different groups or bands as to the “country described” or “claimed” ■by them, which descriptions by the Indians were very general and rather indefinite. Especially was this true in connection with the treaty of July 30 with plaintiff bands. In this treaty Chief Pocatello, of one of the bands, mentioned only the Eaft Eiver and the Porteneuf Mountains in describing the territory “claimed for himself and his people,” and nothing was said with reference to the northern or southern boundaries and nothing whatever with reference to an additional territory of 6,255,000 acres of land now claimed by plaintiff bands lying wholly west of Eaft Eiver. Art. 4 of the treaty with plaintiff bands therefore simply stated: “The country claimed by Pokatello, for himself and his people, is bounded on the west by Eaft Eiver and on the east by the Porteneuf Mountains.” The purpose of obtaining a description of territory from the Indians was, as the letter of instructions of July 22, 1862, stated, to obtain as much information as possible as to what territory the Indians claimed, because the Government had no information in that regard from the Indians themselves, and very indefinite information otherwise as to the territory which they occupied.
We do not think the amendment added by the Senate constituted a recognition and acknowledgment of exclusive use and occupancy right or. title by the Indians. That amendment did not have any relation to any territory not within the Mexican Cession. As to such territory *692 mentioned in the treaty as fell within the Mexican Cession, the amendment was simply a limitation on the right or title of the Indians based on aboriginal occupancy, if, as a matter of law, there was such a limitation under Mexican law in 1848. Without the amendment the treaty did not admit or deny aboriginal occupancy, nor did it acknowledge the right of exclusive use and occupancy as against the United States. The amendment therefore added nothing to the treaty in this respect.
In 1939 the General Land Office prepared a map based on more accurate information which followed the general outlines roughly indicated by Commissioner Doty on the map (finding 14) which accompanied the treaties and this 1939 map also showed the boundaries to the extent mentioned in the various treaties. After indicating the exterior boundaries within the general outlines shown on the Doty map, the Government computed the acreage therein. The entire area embraced within the general exterior lines shown on the Doty map which accompanied the treaty, as corrected and computed on the 1939 map, comprised 80,825,000 acres of land. The entire population of the Shoshone tribe and affiliated Bannock bands of Indians in 1863 was between 9,000 and 10,000; the population of the Eastern bands was about 4,500; that of the Northwestern Bands, about 1,800; that of the Western bands, about 2,000; and that of the Goship-Shoshone Bands, about 1,000. The number of Bannocks, or the Mixed Bands of Bannocks and Shoshones not included in the above-mentioned population of the Eastern Bands, was about 400. No census was taken by the agents of the Government; these figures as to population are approximate.
Upon the whole record we are of opinion that plaintiff bands are not entitled to recover under the treaty of July 30, 1863, as for a taking by the United States of any land for the reason that the defendant did not, in the treaty, set aside any specific area for the exclusive use and occupancy by plaintiffs, and did not, by the treaty, recognize or acknowledge any exclusive use and occupancy right and title of the Indians to the whole or any portion of the acreage here claimed. In reaching this conclusion we have *693 not departed from the rules to be followed in the interpretation of treaties with the Indians, as set forth in Jones v. Meehan, 175 U. S. 1; United States v. Winans, 198 U. S. 371; Choctaw Nation v. United States, 119 U. S. 1, 21; Choctaw Nation v. United States, 179 U. S. 494, 531-534; Carpenter et al. v. Shaw, 280 U. S. 363, 365; Blackfeet et al. Tribe v. United States, 81 C. Cls. 101.
Plaintiff bands claim that the defendant failed to fulfill the promises which it made in the treaty with reference to the annuity of $5,000 per annum for twenty years, totaling $100,000. This entire amount was appropriated by Congress in twenty annual instalments and the record satisfactorily shows that the total of the amount so appropriated except $10,804.17 was expended and disbursed by the Government in goods and provisions for the Indians of the Northwestern Bands. How and why the deficiency of $10,804.17 in the annuity goods due the Indians of the Northwestern. Bands came about does not appear and the Government records do not disclose what became of this sum. After the treaty of July 30 with plaintiff Indians, band affiliations became practically lost. Some of these Indians went to the Wind River Reservation with the Eastern Band of Shoshones, some to the Fort Hall Indian Reservation in Idaho, some to the Western Shoshone or Duck Valley Indian Reservation in southwestern Idaho and northern Nevada, and an indefinite number of individual Indians of the Northwestern Bands continued to roam and live in northern Utah and southern Idaho and worked at times for white settlers. Whether this balance of $10,804.17 was not expended and disbursed in annuity goods for the Northwest Shoshone Indians because they were so scattered or whether the appropriation lapsed and the fund reverted to the Treasury does not appear. Plaintiff bands have submitted no proof to show that the defendant took this money for its own use or took it from plaintiff bands and gave or expended it for Indians other than the Indians of the Northwestern Bands.
Plaintiff bands are entitled to recover this sum of $10,804.17 to the extent that it may exceed any allowable offsets to which the defendant may show itself entitled under section 3 of the Jurisdictional Act on further pro *694 ceedings under Rule 39(a). But plaintiff bands are not entitled to recover interest on this deficiency in the treaty annuities from the years in which the last two of the twenty annuity instalments were due, for the reason that the record does not establish that this money was taken by the United States under such circumstances as would entitle the plaintiff bands to interest as a part of just compensation. The Choctaw Nation v. United States, 91 C. Cls. 320, 402, 403.
The claim of plaintiffs for compensation as for a taking by the defendant of lands is dismissed, and an interlocutory order under Rule 39(a) is hereby entered reserving the determination of the amount of recovery, if any, in respect of the amount of $10,804.17 after determination of the amount of offsets, if any, for further proceedings. It is so ordered.
Madden, Judge; Jones, Judge; Whitaker, Judge; and Whaley, Chief Justice, concur.