**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NORTHWESTERN BAND OF THE SHOSHONE NATION, a federally recognized Indian tribe on its own behalf and as parens patriae on behalf of its members, | No. 22-35140 |
| | D.C. No. 4:21-cv-00252-DCN |
| *Plaintiff-Appellant*, | OPINION |
| v. | |
| GREG WOOTEN, Department of Fish and Game Enforcement Bureau Chief; ED SCHRIEVER, Department of Fish and Game Director; DOES, 1-10, | |
| *Defendants-Appellees*, | |

Appeal from the United States District Court
for the District of Idaho
David C. Nye, Chief District Judge, Presiding

Argued and Submitted February 6, 2023
Portland, Oregon

Filed October 17, 2023

Before:  Milan D. Smith, Jr., Danielle J. Forrest, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Sung

# SUMMARY[*]

## Treaties/Tribes

The panel reversed the district court's judgment dismissing for failure to state a claim the Northwestern Band of the Shoshone Nation's complaint against Idaho state officials, and remanded, in a case concerning the interpretation of the 1868 Treaty of Fort Bridger between the United States and several bands of the Shoshone and Bannock Tribes, including the Shoshone's Northwestern Band.

Under the Treaty, the affiliated Shoshone and Bannock Tribes ceded most of their territory to the United States. At the same time, the Tribes expressly reserved their right to hunt on unoccupied lands of the United States.

Idaho officials contend that the Treaty conditions the reserved hunting right on permanent residence on a designated reservation, and that Northwestern Band members may not exercise the Tribes' treaty-reserved hunting right because the Northwest Band does not reside on a designated reservation.

Disagreeing, the panel held that the Treaty's terms, which must be read in context and construed as they would naturally be understood by the Tribes, plainly do not condition exercise of the reserved hunting right on the Northwestern Band relocating to a reservation.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Because the district court did not reach the Idaho officials' alternative arguments regarding political cohesion and necessary joinder, the panel remanded the case for the district court to address those issues in the first instance.

## COUNSEL

Ryan Frazier (argued), Kirton and McConkie, Salt Lake City, Utah, for Plaintiff-Appellant.

Owen Moroney (argued) and Kathleen Trever, Deputy Attorneys General; Lawrence G. Wasden, Idaho Attorney General; Darrell Early, Chief of Natural Resources; Idaho Attorney General's Office, Boise, Idaho, for Defendants-Appellees.

Mary G. Sprague (argued), William B. Lazarus, and Rachel Heron, Attorneys; Todd Kim, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Samuel Ennis, Attorney, United States Department of the Interior, Washington, D.C.; for Amicus Curiae United States of America.

Lance Sorenson (argued), Assistant Attorney General, Utah Attorney General's Office, Salt Lake City, Utah; Melissa A. Holyoak, Senior Counsel; Sean D. Reyes, Utah Attorney General; Utah Attorney General's Office, Salt Lake City, Utah; for Amicus Curiae State of Utah.

Jack W. Fiander, Towtnuk Law Offices LTD, Sacred Ground Legal Services, Inc., Yakima, Washington, for Amicus Curiae Sacred Ground Legal Services.

William F. Bacon, General Counsel, Shoshone Bannock

Tribes, Trial Attorney's Office, Fort Hall, Idaho, for Amicus Curiae Shoshone Bannock Tribes of the Fort Hall Reservation.

---

## OPINION

SUNG, Circuit Judge:

In this case, we must interpret the 1868 Treaty of Fort Bridger (the "Treaty") between the United States and several bands of the Shoshone and Bannock Tribes, including the Shoshone's Northwestern Band. Under the Treaty, the affiliated Shoshone and Bannock Tribes ceded most of their territory to the United States. *See* Treaty with the Eastern Band Shoshoni and Bannock, art. II, July 3, 1868, 15 Stat. 673. At the same time, the Tribes expressly reserved their right to hunt on unoccupied lands of the United States. *Id*. at art. IV. It is undisputed that the Tribes' reserved hunting right remains valid.

Idaho officials, however, contend that the Treaty conditions the reserved hunting right on permanent residence on a designated reservation. Under the Idaho officials' interpretation, Northwestern Band members may not exercise the Tribes' treaty-reserved hunting right because the Northwestern Band does not reside on a designated reservation. We disagree. The Treaty's terms, which we must read in context and construe as they would naturally be understood by the Tribes, plainly do not condition exercise of the reserved hunting right on the Northwestern Band relocating to a reservation.

## I.

The Shoshone, "from time immemorial, roamed over, lived upon, occupied, and used" over 80 million acres of territory in present-day Idaho, Colorado, Utah, Nevada, and Wyoming. *Northwestern Bands of Shoshone Indians v. United States*, 95 Ct. Cl. 642, 644 (1942), *aff'd*, 324 U.S. 335 (1945) ("*Northwestern Bands I*"). The Shoshone relied on hunting, fishing, and gathering practices for their support and livelihood. *Id*. at 644–45. In the 1860s, the Shoshone Tribe comprised at least fourteen regional bands, including the Northwestern Band. *Id.* at 644. The Shoshone Tribe was also affiliated with the Bannock Tribe. *Id.*

By 1849, the westward migration and settlement of European Americans had caused substantial losses to game and other natural resources on which the Shoshone depended for survival. *Id.* at 646–47. Many Shoshone were "reduced to a condition of practical starvation[.]" *Id.* at 646. Around 1859, the Commissioner of Indian Affairs reported that some Shoshone were occasionally attacking emigrant trains crossing their territory, in part because "of their destitute and desperate condition," and in part because of "the conduct of certain unscrupulous white men." *Id.* at 646–49.

In January 1863, the colonel commanding the Military District of Utah attacked a Shoshone encampment at Bear River, killing hundreds of Shoshone and nearly exterminating one of the bands. *Id.* at 653. By June of that year, the Commissioner of Indian Affairs directed the Superintendent of Indian Affairs for the Territory of Utah, James Duane Doty, to meet with the Shoshone so that, according to Commissioner Doty, "some arrangement may be made by which they can with satisfaction return to their hunting grounds, and upon terms which shall secure peace

hereafter, safety to the emigrants and travellers [sic], and relieve the department from the expense now being incurred." *See id.* at 656–57. Between July and October 1863, the United States entered into five treaties of "peace and amity" with different Shoshone bands: the Eastern Shoshone Treaty, the Northwestern Shoshone Treaty, the Western Shoshone Treaty, the Shoshonee-Goship Treaty, and the Mixed Bands Treaty. *Id.* at 657–68; *Northwestern Bands of Shoshone Indians v. U.S.*, 324 U.S. 335, 341–42 (1945) ("*Northwestern Bands II*"). Under these treaties, the United States agreed to pay annuities to the Shoshone Bands to secure peace. *Northwestern Bands II*, 324 U.S. at 346.

In 1868, the United States, certain Shoshone bands, and the affiliated Bannock Tribe entered into the Treaty of Fort Bridger, the treaty at issue in this case. The main chief of the Shoshone, Chief Washakie, negotiated and signed the Treaty on behalf of multiple bands comprising the "Shoshone Tribe," including the Northwestern Band. *See Shoshone Tribe of Indians of Wind River Rsrv., Wyoming v. United States*, 11 Ind. Cl. Comm. 387, 402–04 (1962). The Indian Claims Commission found that the Northwestern Band was represented by Chief Washakie and bound by the terms of the Treaty, even though the Northwestern Band's leader, Chief Pocatello, was not present at the 1868 Treaty signing. *Id.* The Commission also found that the land the Shoshone ceded to the United States included the Northwestern Band's "favored" locations in Southern Idaho and northern Utah. *Id.* at 404, 413–15.

In Article I of the Treaty, the parties pledged to maintain peace. 15 Stat. at 673. In Article II, the United States agreed to "set apart for the absolute and undisturbed use and occupation of the Shoshonee [sic] Indians" a reservation in the Wind River area of present-day Wyoming. *Id.* at 674.

The United States also agreed that "whenever the Bannacks [sic] desire a reservation to be set apart for their use, or whenever the President of the United States shall deem it advisable for them to be put upon a reservation," the President would "cause a suitable one to be selected for them in their present country." *Id*. The Tribes agreed to "relinquish all title, claims, or rights in and to any portion of the territory of the United States" outside of those reservations.[1] *Id*. In Article III, the United States agreed to construct various buildings on the Shoshone reservation. *Id.*

Article IV, which includes the disputed hunting-right provision, states in full:

> The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts.

*Id.* at 674–75.[2]

---

[1] The Shoshone ceded over 41 million acres to the United States. *See Shoshone Tribe of Indians of Wind River Rsrv. in Wyoming v. United States*, 299 U.S. 476, 485 (1937); *Shoshone Tribe*, 11 Ind. Cl. Comm. at 412, 415.

[2] The parties agree that the "right to hunt" includes the right to hunt and fish.

The second reservation that Article II contemplated was established in the Fort Hall area of present-day Idaho by Executive Order dated July 30, 1869.

In 1873, the Commissioner of Indian Affairs established a commission to "investigate all tribes and bands in this region and to ascertain their number and the probability of gathering them upon one or more reservations where they could be more immediately under the care of the Government." *Northwestern Bands I*, 95 Ct. Cl at 677. The commission found that, as of 1873, an indefinite number of Northwestern Shoshones had moved to the Wind River Reservation, 400 resided on the Fort Hall Reservation, and 400 resided in southern Idaho. *See id.* at 677–78. Additionally, in 1873, an Indian agent assigned a number of Northwestern Shoshones who had gathered in northeastern Nevada to a small tract there, which was established as a reservation by Executive Order in 1877. *Id.* at 678. However, that reservation was terminated in 1879, and the Shoshones who resided there were moved to the Duck Valley Indian Reservation established for the Western Shoshone. *Id.* Another group of Northwestern Shoshones settled in northern Utah.

The group of Northwestern Shoshones who settled in Utah is federally recognized as the Northwestern Band of the Shoshone Nation. The federal government maintains separate government-to-government relationships with the Northwestern Band, the Eastern Shoshone Tribe of the Wind River Reservation, and the Shoshone-Bannock Tribes of the Fort Hall Reservation. *See* 87 Fed. Reg. 4636, 4636–39 (Jan. 28, 2022).

In 1985, the Northwestern Band asked the Bureau of Indian Affairs within the U.S. Department of the Interior

(DOI) to confirm that the Band maintained hunting and fishing rights under the 1868 Treaty. In a memorandum dated March 20, 1985, Lawrence E. Cox, Acting Regional Solicitor, Pacific Northwest Region, concluded that "the Northwestern Band does possess treaty protected hunting and fishing rights which may be exercised on the unoccupied lands within the area acquired by the United States pursuant to the 1868 Treaty of Fort Bridger." In reaching that conclusion, the DOI adopted the findings of the Indian Claims Commission, including the finding "that Chief Washakie represented the interests of all Shoshone Indians, including the absent Northwestern Band led by Pocatello," at the Treaty signing. Because the Northwestern Band was represented by Chief Washakie at the Treaty signing, the DOI concluded that "the Northwestern Band's rights derive directly from the treaty as a signatory."

In 1997, Idaho cited two members of the Northwestern Band, Shane and Wayde Warner, for hunting big game out of season, a misdemeanor under state law. The Warners asserted their hunting right under the Treaty as a defense. The state court rejected that defense, because it interpreted the Treaty as conditioning the hunting right on permanent residence on a reservation. *State of Idaho v. Warner*, Idaho Case Nos. CR-98-00014 and CR-98-00015 (Idaho Dist. Ct. Nov. 1, 2000). Thus, in the state court's view, the Treaty's hunting right vested only in the Eastern Shoshone Tribe at the Wind River Reservation and the Shoshone-Bannock Tribe at the Fort Hall Reservation, and the Northwestern Band could not exercise the Treaty-protected hunting right unless it maintained political cohesion with either of those tribal entities. *Id*. The state court also found that the Northwestern Band had failed to maintain the required political cohesion. *Id.*

In 2019, Wyatt Athay and Shanelle Long, also Northwestern Band members, asserted their hunting right under the Treaty as a defense to Idaho-issued citations for hunting without tags. The parties agreed to stay the matter pending the resolution of this case, in which the Northwestern Band seeks a declaration that it possesses the Treaty-protected hunting right.

The Northwestern Band filed the complaint in this case against the State of Idaho, Governor Brad Little, Idaho Department of Fish and Game Director Ed Schriever, and Idaho Department of Fish and Game Enforcement Bureau Chief Greg Wooten.[3]

Defendants moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7). The district court concluded that the Eleventh Amendment bars the claims against the State of Idaho and granted the motion to dismiss under Rule 12(b)(1) "only as it relates to the State of Idaho." The Northwestern Band does not appeal the dismissal of the State of Idaho from the case.

The district court also granted Defendants' motion to dismiss the complaint in its entirety for failure to state a claim under Rule 12(b)(6). Defendants argued that the Treaty conditioned the hunting right on permanent residence on either the Fort Hall Reservation or the Wind River Reservation, and that the Northwestern Band failed to satisfy that condition. Defendants also argued that the Northwestern Band could exercise the hunting right only if it maintained political cohesion with the Eastern Shoshone Tribe or the Shoshone-Bannock Tribe, and that the Band had failed to do so.

---

[3] The parties stipulated to the dismissal of Governor Little from the case.

The district court agreed with Defendants' treaty interpretation. The district court declined to address whether the Northwestern Band has maintained political cohesion with the other Shoshone tribes. The district court also declined to decide whether the complaint should be dismissed for failure to join an indispensable party under Rule 12(b)(7).[4]

The only issue on appeal is whether the district court erred in concluding that the Treaty makes the reserved hunting right contingent on permanent residence on the Fort Hall or Wind River Reservations. We review de novo the interpretation of treaty language. *United States v. State of Wash.*, 969 F.2d 752, 754 (9th Cir. 1992).

## II.

"A treaty is 'essentially a contract between two sovereign nations.'" *Herrera v. Wyoming*, 139 S. Ct. 1686, 1699 (2019) (quoting *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, *modified sub nom. Washington v. United States,* 444 U.S. 816 (1979)). "Treaty analysis begins with the text, and treaty terms are construed as 'they would naturally be understood by the Indians.'" *Id.* at 1701 (quoting *Fishing Vessel Ass'n.*, 443 U.S. at 676). To determine how terms would have been understood by the Indians who are parties to the treaty, "we look beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Minnesota v. Mille Lacs Band of Chippewa*

---

[4] Defendants contended that the complaint "should be dismissed under Rule 12(b)(7) for failure to join a necessary and indispensable party that cannot be joined due to sovereign immunity, the Shoshone-Bannock Tribes of the Fort Hall Indian Reservation."

*Indians*, 526 U.S. 172, 196 (1999). Any ambiguities must be "resolved in favor of the Indians.'" *Id.* at 206.

The Idaho officials contend that Article IV of the Treaty makes the hunting right contingent on permanent residence on one of the designated reservations. The Northwestern Band contends that Article IV reserves their aboriginal hunting right on the ceded lands without requiring relocation to a reservation. For the reasons discussed below, we agree with the Northwestern Band's interpretation.[5]

We begin with the Treaty text. In Article I, the parties promised they would maintain peaceful relations. In Article II, the Tribes "relinquish[ed] all title, claims, or rights in and to" over 40 million acres of land—effectively giving up their

---

[5] The Shoshone-Bannock Tribes of the Fort Hall Reservation filed an amicus brief in support of the State of Idaho seeking affirmance of the district court's dismissal order. However, although the Shoshone-Bannock Tribes of the Fort Hall Reservation explain that they "oppose[] expanding the Fort Bridger off-reservation treaty rights" to the Northwestern Band, they do not actually endorse the Idaho officials' interpretation of the Treaty. We also note that the Idaho defendants submitted a declaration of the Chairman of the Fort Hall Business Council, Devon Boyer, in support of their motion to dismiss for failure to join a necessary party under Fed. R. Civ. P. 12(b)(7). In the declaration, Chairman Boyer explains that the Tribal Code of the Shoshone-Bannock Tribes of the Fort Hall Reservation provides: "Only enrolled members of the Shoshone-Bannock Tribes who make the Fort Hall Reservation their permanent home shall enjoy the off-Reservation Tribal hunting and fishing rights as set forth pursuant to the Fort Bridger Treaty of July 3, 1868, and subsequent agreements between the Shoshone-Bannock Tribes and the United States government." While Chairman Boyer explains how the Shoshone-Bannock Tribes' Tribal Code regulates and protects their hunting and fishing rights, he does not state that the Shoshone-Bannock Tribes agree with the Idaho defendants' interpretation of the Treaty, or otherwise explain how the Shoshone-Bannock Tribes interpret the Treaty.

nomadic way of life in which they roamed over and lived on a vast territory. In exchange, the United States promised to "set apart" some land for the "absolute and undisturbed use and occupation of the Shoshonee," which is now known as the Wind River reservation. The United States also agreed that "whenever [the Bannock] desire a reservation to be set apart for their use, or whenever the President of the United States shall deem it advisable for them to be put upon a reservation," "a suitable one" would be selected for them "in their present country." In Article III, the United States promised to construct various facilities on the Shoshone reservation. Article IV states, "the Indians herein named agree . . . [to] make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt on the unoccupied lands of the United States . . . ." Reading Article IV in context, we conclude that the Tribes "naturally would have understood" its terms to mean that they were agreeing to give up their claims to and rights in their ancestral territory and relocate to reservations, but also reserving (and thus retaining) their right to hunt throughout that territory.

The Treaty imposes only four conditions on the Tribes' right to hunt. Two of the conditions describe the land where the Tribes may hunt: 1) the land must belong to "the United States," and 2) the land must be "unoccupied." The Treaty also conditions the Tribes' right to hunt using expressly conditional language: the Tribes may hunt 3) "*so long as* game may be found" on the unoccupied federal land, and 4) "*so long as* peace subsists among the whites and Indians on

the borders of the hunting districts." (Emphases added.)[6] The Treaty does not expressly identify permanent residence on a reservation as a fifth condition of the hunting right. If the parties to the Treaty had intended to make permanent residence on a reservation a fifth condition of the hunting right, they could have easily done so, for example, by using the same clear language that they used to impose the other conditions on the hunting right. Because Article IV explicitly imposes only four conditions on the hunting right, we conclude that the parties did not implicitly impose a fifth condition. Further, we conclude that the Tribes would not have naturally understood the terms of Article IV to mean that a tribe, or a band of the tribe, would lose its reserved hunting right if it did not move to a reservation.

A careful reading of Article II confirms that the parties did not intend to make the hunting right contingent on permanent residence on a reservation. In that article, the United States agreed to set aside a reservation for the Shoshone at Wind River. The United States also agreed it would create a second reservation for the Bannock "whenever" either the Bannock "desire[d] a reservation" or the President "deem[ed] it advisable." Thus, at the time of the Treaty signing, it was uncertain that a second reservation for the Bannock would be created. And although Article II generally describes the area in which the potential Bannock reservation would be located, Article II does not specify its

---

[6] *See also Herrera*, 139 S. Ct. at 1694, 1699 (interpreting Crow Treaty containing "identical language reserving an off-reservation hunting right" as "identif[ying] four situations that would terminate the right: (1) the lands are no longer 'unoccupied'; (2) the lands no longer belong to the United States; (3) game can no longer 'be found thereon'; and (4) the Tribe and non-Indians are no longer at 'peace . . . on the borders of the hunting districts'" (quoting art. IV, 15 Stat. 650)).

size or geographic boundaries. Because the establishment of a potential Bannock reservation was uncertain, we conclude that the Indians would not have understood Article IV to mean that the Bannock (or any Shoshone band) would forfeit its reserved hunting right if it did not reside on a reservation.

The Idaho officials' counterarguments are unpersuasive. The Idaho officials agree that the Treaty drafter's use of the conjunction "but" in Article IV makes the second clause (the reserved hunting right) "an exception" to the first clause (the promise to reside on reservations). Yet, they also argue that the conjunction "but" makes the first clause a *condition* of the second clause. The Idaho officials do not identify any definition of the word "but" that would make the first clause a condition of the second. Instead, they broadly argue that because Article IV joins the two clauses with a conjunction, the first clause is related to the second clause. On that much, we can agree. The Idaho officials, however, then argue that because the clauses are related, the first clause (the promise to live on a reservation) must be a condition of the second clause (the right to hunt)—as if that is the only possible relationship between the two clauses. We disagree. In our view, the text and structure of Article IV indicate that the Tribes agreed to cede their land and reside on a reservation on the condition that they would keep their right to hunt on the ceded territory—not the other way around.[7]

---

[7] It is clear to us that the Treaty text does not support the Idaho officials' interpretation. But even if the text were ambiguous, we would be obligated to resolve the ambiguity in favor of the Tribes who are parties to the Treaty, which include the Northwestern Band. *See Mille Lacs*, 526 U.S. at 206; *see also Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1016 (2019) (Gorsuch, J., concurring) ("After all, the

The district court agreed with the Idaho officials' interpretation because, in its view, "the promise to live on the reservation was the most significant promise made by the Indians" in the Treaty, and the United States "grant[ed] Hunting Rights" to the Tribes in exchange for that promise. *Northwestern Band of Shoshone Nation v. Idaho*, 580 F. Supp. 3d 897, 905–06 (D. Idaho 2022). The district court further reasoned that, if the hunting right were *not* conditioned on the Tribes' promise to live on a reservation (as the Northwestern Band contends), then that promise would be "superfluous." [8] *Id.* at 906. In turn, that would mean the United States made a series of promises to the Tribes "for *de minimis* consideration." *Id.* Because "[i]t would make little sense for the government to grant Hunting Rights but not receive anything in exchange," the district court rejected the Northwestern Band's interpretation. *Id.*

We are not persuaded by the district court's reasoning because it misunderstands the Treaty in several significant ways.

First, the United States did not "grant Hunting Rights" to the Tribes; rather, the Tribes ceded their land to the United

---

United States drew up this contract, and we normally construe any ambiguities against the drafter who enjoys the power of the pen. Nor is there any question that the government employed that power to its advantage in this case.").

[8] The district court appears to have assumed that the promise to live on a reservation would be "superfluous" unless a breach of that promise resulted in forfeiture of the hunting right. However, forfeiture of the hunting right is not the only potential remedy. And, as the United States notes in its amicus brief, only the United States may remedy a tribe's alleged breach of the Treaty. *See Fellows v. Blacksmith*, 60 U.S. (19 How.) 366, 370–72 (1856). And, it would be up to the United States to decide what, if any, remedy to pursue.

States but *reserved* their existing right to hunt on that land. *Herrera*, 139 S. Ct. at 1694 (noting that the 1868 Shoshone-Bannock Treaty "reserv[ed] an off-reservation hunting right"); *see also U.S. v. Winans*, 198 U.S. 371, 381 (1905) (noting that a similar treaty "was not a grant of rights to the Indians, but a grant of right from them, [and] a reservation of those not granted").

Second, the United States received substantial consideration under the Treaty: the Tribes promised to maintain peace (Article I) and they relinquished their claims to over 40 million acres of land (Article II).

Third, considering all the Treaty's terms and the historical evidence in the record, we find that the promise to reside on a reservation was *not* critical or material to the parties' agreement. The critical promises made by the Tribes were the promise to maintain peace and the promise to relinquish their land claims. Indeed, the parties expressly made the reserved hunting right contingent on maintaining peace. In contrast, the parties did not expressly make the reserved hunting right contingent on living on a reservation. And the parties neither set a deadline for the United States to complete construction of the promised reservation facilities nor set a deadline for the Tribes to move onto a reservation.

The Idaho officials attached to their answering brief on appeal a report by the United States' negotiator, General Auger, on the Fort Bridger Treaty. This report was not in the record before the district court, which dismissed the Northwestern Band's complaint without an evidentiary hearing. But even assuming we may consider the report, it would support the Northwestern Band's interpretation. General Auger reported that he described living on the reservations as a benefit to the Tribes. Specifically, he told

the Tribes that the United States wanted them to live on the reservations because doing so would make it easier for the federal government to help them, and it would enable the Tribes to survive when game disappeared. General Augur did not describe living on a reservation as a requirement or condition of the hunting right. He did not state that the Tribes would lose their hunting right if they did not move to a reservation. Consequently, the Tribes would not have understood the Treaty's terms to mean that they would forfeit their right to hunt if they did not permanently reside on a reservation.

\* \* \* \* \*

We conclude that the 1868 Treaty does not make maintenance of the Tribes' reserved hunting rights contingent on permanent residence on a designated reservation. Accordingly, we reverse the district court's dismissal of the Northwestern Band's complaint for failure to state a claim under Rule 12(b)(6). Because the district court did not reach the Idaho officials' alternative arguments regarding political cohesion and necessary joinder, we remand this case for the district court to address those issues in the first instance.

**REVERSED AND REMANDED.**